UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRATHONY GRIFFIN, MICHAEL GODWIN and FRANK CALLACE, <br><br> Plaintiffs, <br><br> - against - <br><br> SIRVA, INC., ALLIED VAN LINES, INC. and ASTRO MOVING AND STORAGE CO., INC., <br><br> Defendants. | Civil Action No. 11 CV 1844 (MKB) (WDW) |

---

**DEFENDANTS SIRVA'S AND ALLIED'S
MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

---

GEORGE W. WRIGHT & ASSOCIATES, LLC
Attorneys for Defendants
SIRVA, INC. and ALLIED VAN LINES, INC.
Wall Street Plaza
88 Pine Street
New York, NY  10005
(201) 342-8884

On The Brief:

George W. Wright
Narinder S. Parmar

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES……………………………………………………     ii

PRELIMINARY STATEMENT……………………………………………      1

RELEVANT STATUTES……………………………………………………..     1

LEGAL ARGUMENTS……………………………………………………..      4

POINT I:    PLAINTIFFS' STATE LAW CLAIMS
AGAINST SIRVA AND ALLIED ARE
PREEMPTED BY FEDERAL LAW……………………………………      4

POINT II:   NEITHER SIRVA NOR ALLIED WAS
PLAINTIFFS' EMPLOYER…………………………………………..     14

POINT III:  IF SIRVA OR ALLIED WAS AN
"EMPLOYER" THEY ARE JUSTIFIED
IN EXCLUDING PLAINTIFFS
FROM CUSTOMERS' HOMES……………..……………………….     23

CONCLUSION…………………………………………………………….     29

i

# TABLE OF AUTHORITIES

**Page**

## CASES

Abdu-Brisson v. Delta Air Lines, Inc., 128 F.3d 77 (2nd Cir. 1997)...................   12

American Airlines, Inc. v. Wolens, 513 U.S. 219, 115 S. Ct. 817,
130 L. Ed. 2d 715 (1995)........................................................   6, 10

Am. Trucking Associations, Inc. v. The City of Los Angeles,
577 F.Supp.2d 1101, revd. 559 F.3d 1046 (9th Cir. 2009)...............   7

Arrocha v. Board of Educ. of City of New York, 93 N.Y.2d 361,
690 N.Y.S.2d 503 (Ct. App. 1999)............................................   23-24

Belgard v. United Airlines, 857 P.2d 467  (Ct.App.Colo. 1992).......................   9

Black v. New York State Office of Mental Retardation and
Development Disabilities, 20 Misc.3d 581, 858 N.Y.S.2d 859
(Sup. Ct. 2008)....................................................................   25

Bonacorsa v. Van Lindt, 71 N.Y.2d 605, 528 N.Y.S.2d 519
(Ct. App. 1998)....................................................................   23

Brady v. Helmsley, 246 A.D.2d 486, 668 N.Y.S.2d 198
(1st Dept. 1998)...................................................................   17

Cerdant, Inc. v. DHL Express USA, Inc., 2009 WL 723149
(S.D.Ohio 2009)...................................................................   5

Chatelaine, Inc. v. Twin Modal, Inc., 737 F.Supp.2d 638,
2010 U.S.Dist. LEXIS 85894 (N.D.Tex. 2010)............................   10

Cisco v. United Parcel Services, Inc., 328 Pa. Super. 300,
476 A.2d 1340 (Pa. Super. 1984)..............................................   27-28

County of Milwaukee v. Labor & Industry Review Comm'n,
139 Wis. 2d 805 (Sup. Ct. Wisc. 1987)......................................   24, 27

Deerskin Trading Post, Inc. v. United Parcel Service of America, Inc.,
972 F.Supp. 665 (N.D.Ga. 1997)..............................................   10

Dilts v. Penske Logistics, LLC, 819 F.Supp.2d 1109 (S.D.Cal. 2011)................   8

Dinah v. Salzman Electric Co., Inc.  2005 N.Y. Misc. Lexis 3591
(Sup.Ct. Queens Cty. 2005)………………………………………….....   19, 20

Fitzpatrick v. Simmons Airlines, 218 Mich. App. 689, 555 N.W.2d
479, 1996 Mich. App. LEXIS 285 (Ct. App. Mich. 1996)………………………....   9

French v. Pan Am Express, Inc., 869 F.2d 1 (1st Cir. 1989)…………………………   9

Frey v. Bekins Van Lines, Inc., 802 F.Supp. 438 (E.D.N.Y. 2011)………………   10

Gallo v. State, Office of Mental Retardation and Developmental
Disabilities, 37 A.D.3d 984, 830 N.Y.S.2d 796 (3d Dept. 2007)………………………   25

Gemakian v. Kenny Int'l Corp., 151 A.D.2d 342, 543 N.Y.S.2d 66
 (1st Dept. 1989)………………………………………………………   15

Goyette v. DCA Advertising Inc., 830 F.Supp. 737 (S.D.N.Y. 1993)……………   15

Hirschfeld v. Institutional Investor, Inc., 260A.D.2d 171, 688 N.Y.S.2d
31 (1st Dept. 1999)……………………………………………………   17

Hodges v. Delta Air Lines, Inc., 44 F.3d 334 (5th Cir. 1995)………………………   5

Houston v. Fidelity (National Financial Services), 1997 U.S. Dist.
LEXIS 2366 (S.D.N.Y. 1997)………………………………………………   15, 16

Huntington Operating Corp. v. Sybonney Express, Inc.,
2010 U.S.Dist. LEXIS 55591 at *6 (S.D.Tex. 2010)…………………………………   10

In the Matter of the Board of Higher Education v. Carter, 14 N.Y.2d 138,
 250 N.Y.S.2d 33 (1964)…………………………………………………   14

In the Matter of Delta Air Lines v. New York State Division of
Human Rights, 91 N.Y. 65, 666 N.Y.S.2d 1004 (1997)……………………………   12

In the Matter of Formica Construction, Inc. v. Mintz,
65 A.D.3d 686, 885 N.Y.S.2d 298 (2nd Dept. 2009)……………………………….....   25

In re Villa Maria Institute of Music v. Ross, 54 N.Y.2d 691,
442 N.Y.S.2d 972 (1981)………………………………………………   15

Jacobson v. Comcast Corp., 740 F. Supp. 2d 683 (D. Md. 2010)………………….....   21, 22

Kashala v. Mobility Svcs. Intl., LLC, 2009 U.S.Dist. LEXIS 64334
(D.Mass. 2009)……………………………………………………...   10

Lawrence v. Adderley Indus., 2011 U.S. Dist. LEXIS 14386
(E.D.N.Y. 2011)………………………………………………………   20, 21, 22

Louisiana Public Service Comm'n v. F.C.C., 476 U.S. 355 (1986)………………   13

Mallette v. United States Sec. Assocs., 2008 U.S. Dist. LEXIS
(E.D.Pa. 2008)……………………………………………………...   28

Morales v. Trans World Airlines, Inc., 504 U.S. 374,
112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992)……………………………………   5

Moses v.  Browning-Feris Industries of Kansas City, Inc.
1986 U.S. Dist. LEXIS 20073 (D. Kan. 1986)…………………………………   28

People v. Wyatt, 931 N.Y.S.2d 85 (2nd Dept. 2011)………………………………   26-27

Rice v. Sante Fe Elevator Corp., 331 U.S. 218 (1947)……………………………   13

Roberts v. North American Van Lines, 394 F.Supp.2d 1174
(N.D.Cal. 2004)……………………………………………………...   13

Robins v. Max Mara, U.S.A., Inc., 923 F. Supp. 460 (S.D. 1998)………………   17

Roundout Elec., Inc. v. N.Y. State DOL, 335 F.3d 162 (2d Cir. 2003)…………...   13

Rowe v. New Hampshire Motor Transport Assn., 552 U.S. 364,
128 S. Ct. 989, 169 L. Ed. 2d 933 (2008)…………………………………………   5

State Division of Human Rights v. GTE Corp., 109 A.D.2d 1082,
487 N.Y.S.2d 234 (4th Dept. 1985)………………………………………………   15

Yellow Transportation, Inc. v. DM Transportation Mgmt. Svcs. Inc.,
  2006 U.S. Dist. LEXIS 51231 (E.D.Pa. 2006)…………………………………...   10

**STATUTES**

49 U.S.C. §§ 101, et. seq…………………………………………………… 4

49 U.S.C. § 14501…………………………………………………………… 1, 4

49 U.S.C. § 41713…………………………………………………………… 4

49 C.F.R. Parts 40, 380, 382, 383, 390-392, 395 and 399…………………………... 13

108 Stat. 1605-1606………………………………………………………… 4

H.R. Conf. Rep. No. 103-677, 103rd Cong., 2d Sess. 85 (1994),
reprinted in 1994 U.S.C.C.A.N. 715……………………………………….. 4

New York Executive Law § 296……………………………………………… 1, 2, 11, 29

New York Corrections Law § 752…………………………………………… 2, 11, 29

New York Corrections Law § 753…………………………………………... 2, 11

18 Pa. Cons. Stat. § 9125…………………………………………………… 28

**COURT RULES**

Fed.R.Civ.P.56………………………………………………………………… 1

**MISCELLANEOUS**

Black's Law Dictionary, 1533 (4th Ed. 1968)…………………………………… 5

## PRELIMINARY STATEMENT

This Memorandum of Law is respectfully submitted on behalf of defendants, SIRVA, INC. ('SIRVA") and ALLIED VAN LINES, INC. ("ALLIED") in support of their motion for an Order pursuant to Fed.R.Civ.P. 56 granting summary judgment dismissing the Complaint (Doc.1) against them.

The Complaint (Doc.1, ¶23) alleges that all defendants unlawfully denied plaintiffs TRATHONY GRIFFIN ("GRIFFIN") and MICHAEL GODWIN ("GODWIN") employment in violation of New York Executive Law Section 296(15). The Complaint further contends: (A) there is no direct relationship between plaintiffs' criminal convictions and their employment by defendant ASTRO MOVING AND STORAGE CO., INC. ("ASTRO") and (B) the continuation of plaintiffs' employment by ASTRO would not involve an unreasonable risk to the property or safety of specific individuals or the general public.

Plaintiffs' claims against SIRVA and ALLIED should be dismissed because: (A) plaintiff's claims against ALLIED are preempted by federal law; (B) SIRVA and ALLIED were not plaintiffs' employers; and (C) New York law does not mandate the result demanded by GRIFFIN and GODWIN. GRIFFIN and GODWIN argue that, despite their rape and first-degree sexual assault convictions against 7-year old children, they should be allowed to enter the homes and businesses of ALLIED's unsuspecting customers and have unsupervised access to their family members and employees.

## RELEVANT STATUTES

### 49 U.S.C. Sec. 14501(c)(1)

> A State ... may not enact or enforce a law ... related to a price, route, or service of any carrier ... with respect to the transportation of property.

**New York Executive Law § 296**

**§ 296.  Unlawful discriminatory practices**

15. It shall be an unlawful discriminatory practice for any person, agency, bureau, corporation or association, including the state and any political subdivision thereof, to deny any license or employment to any individual by reason of his or her having been convicted of one or more criminal offenses, or by reason of a finding of a lack of "good moral character" which is based upon his or her having been convicted of one or more criminal offenses, when such denial is in violation of the provisions of article twenty-three-A of the correction law. Further, there shall be a rebuttable presumption in favor of excluding from evidence the prior incarceration or conviction of any person, in a case alleging that **the employer** has been negligent in hiring or retaining an applicant or employee, or supervising a hiring manager, if after learning about an applicant or employee's past criminal conviction history, **such employer** has evaluated the factors set forth in section seven hundred fifty-two of the correction law, and made a reasonable, good faith determination that such factors militate in favor of hire or retention of that applicant or employee. (emphasis added).

**New York Corrections Law § 752**.

§ 752.  Unfair discrimination against persons previously convicted of one or more criminal offenses prohibited.

No application for any license or employment, and no employment or license held by an individual, to which the provisions of this article are applicable, shall be denied or acted upon adversely by reason of the individual's having been previously convicted of one or more criminal offenses, or by reason of a finding of lack of "good moral character" when such finding is based upon the fact that the individual has previously been convicted of one or more criminal offenses, unless:

(1) there is a direct relationship between one or more of the previous criminal offenses and the specific license or employment sought or held by the individual; or

(2) the issuance or continuation of the license or the granting or continuation of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

2

## New York Corrections Law § 753.

### § 753. Factors to be considered concerning a previous criminal conviction; presumption.

1. In making a determination pursuant to section seven hundred fifty-two of this chapter, the public agency or **private employer** shall consider the following factors:

(a) The public policy of this state, as expressed in this act, to encourage the licensure and employment of persons previously convicted of one or more criminal offenses.

(b) The specific duties and responsibilities necessarily related to the license or employment sought or held by the person.

(c) The bearing, if any, the criminal offense or offenses for which the person was previously convicted will have on his fitness or ability to perform one or more such duties or responsibilities.

(d) The time which has elapsed since the occurrence of the criminal offense or offenses.

(e) The age of the person at the time of occurrence of the criminal offense or offenses.

(f) The seriousness of the offense or offenses.

(g) Any information produced by the person, or produced on his behalf, in regard to his rehabilitation and good conduct.

(h) The legitimate interest of the public agency or **private employer** in protecting property, and the safety and welfare of specific individuals or the general public.

2. In making a determination pursuant to section seven hundred fifty-two of this chapter, the public agency or **private employer** shall also give consideration to a certificate of relief from disabilities or a certificate of good conduct issued to the applicant, which certificate shall create a presumption of rehabilitation in regard to the offense or offenses specified therein.

3

**LEGAL ARGUMENTS**

**POINT I**

**PLAINTIFFS' STATE LAW CLAIMS**
**AGAINST SIRVA AND ALLED ARE**
**PREEMPTED BY FEDERAL LAW**

The interstate motor carrier industry, and particularly the interstate household goods moving industry, is heavily regulated by federal statutes as well as regulations promulgated by the United States Department of Transportation (USDOT), Federal Motor Carrier Safety Administration (FMCSA). The sheer volume of federal law governing ALLIED's interstate moving operations is a clear indication that there is very little for the states to regulate in this area.

**A.   The FAAAA Preemption Statute.**

The ICC Termination Act of 1995 ("ICCTA"), 49 U.S.C. §§101, et. seq. ICCTA Section 14501(c)(1) provides, in part, "A State … may not enact or enforce a law … related to a price, route, or service of any carrier … with respect to the transportation of property." Section 14501(c)(1) is commonly referred to as ICCTA's so-called "FAAAA" preemption clause because adopts virtually identical language contained in the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 108 Stat. 1605-1606, and the Airline Deregulation Act of 1978 ("ADA"); 49 U.S.C. §41713(b)(4)(A) and (b)(4)(B)(i).

Congress's enactment of Section 14501 was explicitly based on the same language governing air carriers set forth in the FAAAA at 49 U.S.C. Section 41713(b)(4)(A) and was "intended to function in the exact same manner with respect to its preemptive effects." H.R. Conf. Rep. No. 103-677, 103rd Cong., 2d Sess. 85 (1994), reprinted in 1994 U.S.C.C.A.N. 715,

757.   <u>Cerdant, Inc. v. DHL Express USA, Inc.</u>, 2009 WL 723149, at *4 (S.D.Ohio 2009) [collecting cases].

ICCTA's FAAAA preemption clause broadly bars state regulation of, and state law causes of action against, interstate motor carriers with respect to their prices, routes and services. "Service" is defined in the context of contracts as "duty or labor to be rendered by one person to another...." <u>Black's Law Dictionary</u>, 1533 (4th Ed. 1968). "'Services' generally represent a bargained-for or anticipated provision of labor from one party to another..." <u>Hodges v. Delta Air Lines, Inc.</u>, 44 F.3d 334, 336 (5th Cir. 1995).

GRIFFIN's and GODWIN's state law discrimination claims against SIRVA and ALLIED directly relate to ALLIED interstate transportation services because plaintiffs seek to impose New York employment law standards on defendants in place of ALLIED's nationwide CLP criteria for selecting the persons who actually perform its interstate services. Furthermore, to the extent that ALLIED's compliance with the New York laws in question could well increase its supervisory and administrative costs, not to mention its liability insurance premiums, such compliance could directly affect ALLIED's prices charged to the public.

The United States Supreme Court held in <u>Morales v. Trans World Airlines, Inc.</u>, 504 U.S. 374, 383, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992) that the ordinary meaning of the statutory phrase "relating to services" is "... a broad one -- 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with...'" and that these words "<u>express a broad pre-emptive purpose</u>" (emphasis added). The High Court further held that that preemption may occur even if a state law's effect on rates, routes, or services "is only indirect," or if the state law is not specifically targeted at the industry or subject

area preempted, and it makes no difference whether a state law is consistent or inconsistent with federal regulation.  Id. at 386-387.

Preemption occurs where state laws have a "significant impact" related to Congress's deregulatory and pre-emption-related objectives.  Id. at 390.   The Supreme Court noted that Congress's goal is to ensure transportation rates, routes, and services that reflect "maximum reliance on competitive market forces," thereby stimulating "efficiency, innovation, and low prices," as well as "variety" and "quality."  Id. at 378.

The Supreme Court similarly held in American Airlines, Inc. v. Wolens, 513 U.S. 219, 115 S. Ct. 817, 130 L. Ed. 2d 715 (1995) that the ADA preempts actions against air carriers under state consumer protection statutes.  Wolens held that the ADA preempted claims alleging that an airline's frequent flyer program was a deceptive practice under state law.  513 U.S. at 226.

In Rowe v. New Hampshire Motor Transport Assn., 552 U.S. 364, 128 S. Ct. 989, 169 L. Ed. 2d 933 (2008), the Supreme Court held that the ADA's broad preemptive scope applies with equal force to ICCTA Section 14501(c)(1).  The Court applied Section 14501 to invalidate a Maine law requiring licensed tobacco retailers to "utilize a delivery service" providing receiver verification and forbidding any person "knowingly" to "transport" a "tobacco product" to another person in Maine unless the sender or the receiver has a Maine license.  Id. at 368-369.  The High Court held that the Maine law affected interstate motor carriers' services and was unenforceable against them:

> The Maine law thereby produces the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for "competitive market forces" in determining (to a significant degree) the services that motor carrier's will provide.  552 U.S. at 378.

6

An interstate household goods carrier that allows, let alone encourages, its agents to use convicted violent sexual predators to perform packing, moving and loading within customers' homes is obviously providing a qualitatively different "service" than a carrier that applies labor standards excluding these persons from such sensitive work. Stated differently, ALLIED and every other major interstate van line knows full well that the "market," that is, the public, demands that moving companies bar certain kinds of violent felons, especially sexual predators, from their homes. The sound business judgment of the interstate moving industry on this issue is entitled to substantial deference by the courts and exemption from state regulation.

The California federal courts have issued several significant rulings involving FAAAA preemption of state regulation of interstate motor carrier employment practices. The District Court and Circuit Court of Appeals decisions in <u>Am. Trucking Associations, Inc. v. The City of Los Angeles</u>, 577 F.Supp.2d 1101, revd. 559 F.3d 1046 (9th Cir. 2009) are highly instructive. In the <u>ATA</u> case, the Los Angeles Harbor Board adopted rules governing port drayage truckers operating under concession agreements with the City. The regulations and concession agreements required, among other things, that the draymen phase out their independent contractor drivers and use only employee drivers. Applying an FAAAA preemption analysis, the District Court held:

> … [T]he concession agreements do establish requirements for motor carriers' hiring decisions … driver credentials … security … [I]f motor carriers do comply with these requirements, such compliance would presumably be costly, would at least likely have an effect on the price of services that the motor carriers charge their customers, and might, as plaintiff argues, have an effect on the services and routes of the motor carriers as well … Thus, like the statute in <u>Rowe</u>, the concession agreements may force motor carriers to change their prices, routes, or services in a way that the market would not otherwise dictate. 577 F.Supp. at 1117.

7

On appeal, the Ninth Circuit reversed and remanded the District Court's rulings on various aspects of the City's challenged port rules. The Court of Appeals, however, adopted the District Court's reasoning with respect to FAAAA preemption of the City's efforts to regulate the draymen's hiring practices. In remanding, the Court of Appeals held:

> [T]he independent contractor phase-out provision is one highly likely to be shown to be preempted ... It is likely that the Ports are imposing the requirements in order to force drayage carriers to hire certain preferred workers over others ... It is a rather blatant attempt to decide who can use whom for drayage services and is a palpable interference with prices and services. Neither motor carriers nor their customers ... would be able to select those with whom they would chose to contract. Port desires for alleged efficiency, not the marketplace, would decide those questions. 559 F.3d at 1056.

The attempt by Los Angeles to compel the plaintiff port truckers to hire a preferred class of drivers may be a more direct form of interference with carrier operations than New York's laws that generally promote employment of the convicted. The degree of directness, however, is of no moment because the New York Executive and Corrections Laws -- as applied to ALLIED's interstate transportation operations -- "relate" to its services and prices.

In Dilts v. Penske Logistics, LLC, 819 F.Supp.2d 1109 (S.D.Cal. 2011), the District Court considered Penske's FAAAA preemption defense to California's meal and rest break law as applied to its drivers. The Court found preemption of the state law:

> It is more importantly the imposition of substantive standards upon a motor carrier's routes and services, as in Morales and Rowe, that implicates preemption here. Just as in Rowe, an emphasis on the additional imposition of costs upon carriers is "off the mark" [citation omitted]. The key instead is that to allow California to insist exactly when and for exactly how long carriers provide breaks for their employees will allow other States to do the same, and to do so differently. "And to interpret the federal law to permit these, and similar, states requirements could easily lead to a patchwork of state service-determining laws, rules, and regulations." Thus, the Court finds state regulation of details

8

significantly impacting the routes or services of the carriers transportation itself preempted by the FAAA Act.  819 F.Supp.2d at 1120.

See also, <u>French v. Pan Am Express, Inc.</u>, 869 F.2d 1,7 (1st Cir. 1989) [holding state law against employee drug testing was preempted by the Federal Aviation Act and finding preemption under doctrine of regulatory field preemption]; <u>Belgard v. United Airlines</u>, 857 P.2d 467 (Ct.App.Colo. 1992) [ADA held to preempt pilots' state law handicap discrimination claims against airline]; <u>Fitzpatrick v. Simmons Airlines</u>, 218 Mich. App. 689 (Ct. App. Mich. 1996) [discrimination claim against airline based on weight and height requirements held preempted by ADA].

In a passage perfectly befitting the case at bar, the Colorado Court of Appeals upheld ADA preemption in <u>Belgard</u>, <u>supra</u>, as follows:

> ... If the states were free to regulate an airline's <u>hiring practices</u> with respect to applicants having, or being perceived to have, a physical handicap, the area of possible conflict would be nearly limitless.  Not only could each state define for itself the very concept of a "handicap," but one state could compel the employment of persons with a particular disability and a second could prohibit such employment, while yet a third could leave the decision within the discretion of the particular airline (emphasis added).  857 F.2d at 471.

For exactly the same reasons, the USDOT-regulated interstate household goods motor carrier industry cannot possibly operate under a 50-state regulatory "patchwork"[1] in which some states encourage the hiring of convicted child rapists as mover helpers, some states forbid it and other states are agnostic on the subject.  Therefore, New York's Executive and Corrections Laws are preempted by the FAAAA to the extent they require ALLIED or its disclosed household goods

---

[1] <u>Dilts</u>, 819 F.Supp.2d at 1120.

agents, like ASTRO, to hire convicted sexual predators to perform interstate moving services in customers' homes and businesses.

In <u>Deerskin Trading Post, Inc. v. United Parcel Service of America, Inc.</u>, 972 F.Supp. 665, 674 (N.D.Ga. 1997), the District Court followed United States Supreme Court precedent and held that the FAAAA statute preempts "…all state law causes of action relating to an airline's rates, routes for services <u>except for routine breach of contract actions with no enlargement or enhancement based on state laws or policies external to the agreement</u> (emphasis original) [citing <u>Wolens</u>, <u>supra</u>].

Numerous federal courts have dismissed state law claims that affect the prices or services provided by interstate motor carriers. See, <u>Frey v. Bekins Van Lines, Inc.</u>, 802 F.Supp. 2d 438 (E.D.N.Y. 2011) [dismissing New York state consumer law claims against household goods carriers for alleged freight charge "low-balling"]; <u>Chatelaine, Inc. v. Twin Modal, Inc.</u>, 737 F.Supp.2d 638, 639-643, 2010 U.S.Dist. LEXIS 85894 (N.D.Tex. 2010) [holding state law claims against freight broker for negligence, negligent hiring and deceptive trade practices preempted by Section 14501]; <u>Huntington Operating Corp. v. Sybonney Express, Inc.</u>, 2010 U.S.Dist. LEXIS 55591 at *6 (S.D.Tex. 2010) [dismissing state law claims against freight broker alleging deceptive trade practices, negligence and negligent misrepresentation based on Section 14501(c)(1) preemption]; <u>Kashala v. Mobility Svcs. Intl., LLC</u>, 2009 U.S.Dist. LEXIS 64334 (D.Mass. 2009) [dismissing negligence claim against freight broker for alleged cargo damage]; <u>Yellow Transportation, Inc. v. DM Transportation Mgmt. Svcs. Inc.</u>, 2006 U.S. Dist. LEXIS 51231 (E.D.Pa. 2006) [holding motor carrier's state law claims against freight broker alleging misrepresentation, unjust enrichment, quantum meruit, fraud and unlawful discounts preempted by FAAAA].

GRIFFIN and GODWIN argue that New York Executive Law § 296 and Corrections Law § 752 bar ALLIED and SIRVA from excluding plaintiffs from performing interstate transportation services to ALLIED's customers. Plaintiffs would use these statutes as free passes to gain entry into ALLIED's customers' homes, despite plaintiffs' convictions for rapes and sexual assaults against small children. As mover helpers, plaintiffs' job duties would require them to enter ALLIED's customers' homes or places of business to perform packing, moving and loading tasks in close proximity with the customers and their families or employees.

ALLIED's CLP standards are designed to control the quality of its labor force utilized to perform its interstate moving services and, thus, the quality of the services rendered to its customers. ALLIED could blithely abandon its CLP standards and let its agents hire workers, like GRIFFIN with "a <u>high</u> risk of repeat offense," in the hope they would not assault a customer or her child if left alone unsupervised on a job. Or ALLIED could require its agents to hire extra supervisors to keep a close eye on such workers. Or ALLIED itself could shoulder the administrative burdens and costs of tracking and complying with New York laws and those of the other 49 states. Inevitably, though, ALLIED's interstate moving services and prices to its customers would be substantially impacted by such compliance efforts.

Requiring interstate motor carriers like ALLIED to comply with a 50-state legal "patchwork" of anti-discrimination laws in their efforts to control labor quality would effectively thwart Congressional goals of national uniformity and free-market competition in the delivery of interstate carriers' services and setting of their prices. Requiring ALLIED and SIRVA to comply with New York Executive Law § 296 and Corrections Law §§ 752-753 would directly "relate to" ALLIED's interstate carrier services and prices. Thus, plaintiffs' state law discrimination claims against SIRVA and ALLIED are preempted by the FAAAA statute, which exempts motor

11

carriers from multi-state laws affecting their service-related decisions, including decisions about the qualifications of those hired to deliver services and the attendant risks.

In <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 128 F.3d 77 (2nd Cir. 1997) the Second Circuit Court of Appeals held that the plaintiff pilots' claims that Delta discriminated against them by violating New York law governing seniority rights, retirement benefits and salaries, were not preempted. The Court found that Delta failed to establish how the plaintiffs' claims affected its services or prices. In a related matter, <u>In the Matter of Delta Air Lines v. New York State Division of Human Rights</u>, 91 N.Y. 65, 666 N.Y.S.2d 1004 (1997) the New York Court of Appeals rejected Delta's argument that the plaintiff flight attendants' disability, age and sex discrimination claims were preempted by the ADA. The Court held that the challenged state laws were too tenuously related to Delta's services or pricing.

Unlike the <u>Delta</u> cases, GRIFFIN's and GODWIN's criminal histories have nothing to do with their ages, gender or race and they assert no claims against SIRVA and ALLIED based on such criteria. On the contrary, plaintiffs' criminal records are closely intertwined with ALLIED's interstate moving services and plaintiffs' personal qualifications to perform them. GRIFFIN and GODWIN argue that, regardless of the enhanced potential danger they pose (GRIFFIN a level "3" sex offender and GODWIN a level "2" sex offender), ALLIED's CLP standards should be scrapped by the Court to enable these plaintiffs' to participate in ALLIED's interstate moving services to its customers in their homes and businesses. If plaintiffs have their way, ALLIED and/or its disclosed household goods agents, like ASTRO, would have to incur additional costs to supervise them and others like them, pay higher liability insurance premiums to employ dangerous felons in sensitive positions and risk serious harm to their businesses and reputations. The dangers posed by the kinds of persons

excluded by ALLIED's CLP standards directly and materially affect the safety and quality of ALLIED's interstate services to its customers. Such dangers also materially affect ALLIED's potential labor, insurance, liability and other overhead costs and, consequently, ALLIED's prices. Consequently, plaintiffs' state law discrimination claims against SIRVA and ALLIED are preempted by the FAAAA statute.

**B.    The FMCSA's Interstate Motor Carrier Regulations.**

   In addition to the broad scope of the ICCTA statute governing interstate motor carriers, the FMCSA has promulgated voluminous regulations governing interstate motor carrier employee hiring, training, licensing, testing, safety and health standards. See, 49 C.F.R. Parts 40, 380, 382, 383, 390-392, 395 and 399. The FMCSA's exhaustive regulations contain no rules for screening interstate household goods agents' workers for criminal histories. Thus, the agency has left this area to the discretion of the regulated interstate motor carriers.

   Congress's and the USDOT's decisions <u>not</u> to regulate interstate household goods motor carrier employment policies with respect to hiring of persons with criminal convictions means the states may not impose their diverse and inconsistent policies on interstate moving companies in this area. See, <u>Louisiana Public Service Comm'n v. F.C.C.</u>, 476 U.S. 355, 368 (1986); <u>Rice v. Sante Fe Elevator Corp.</u>, 331 U.S. 218, 230 (1947); <u>Roundout Elec., Inc. v. N.Y. State DOL</u>, 335 F.3d 162, 166 (2d Cir. 2003); <u>Roberts v. North American Van Lines</u>, 394 F.Supp.2d 1174,1184 (N.D.Cal. 2004) [dismissing suit alleging defendant van line deceived customers with artificially low prices and holding, "The federal regulatory scheme governing the interstate transportation of household goods is so pervasive as to make reasonable the inference that Congress left no room for state law to operate in this area"].

## POINT II

### NEITHER SIRVA NOR ALLIED
### WAS PLAINTIFFS' EMPLOYER

**A.    As a Mere Holding Company of ALLIED's Parent Companies,
SIRVA's Connection With ASTRO's Employees Is Extremely Remote.**

The New York statutory provisions at issue in this case expressly apply only to a complainant's "employer."  Neither SIRVA nor ALLIED was an "employer" of GRIFFIN or GODWIN.

New York Executive Law § 296 ("Human Rights Law" or "HRL") does not define the term "employer."  New York Corrections Law § 750 (2) defines "Private Employer" as "any person, company, corporation, labor organization or association which employs ten or more persons."  The word "employer" as used in the HRL should be construed according to its "accepted and dictionary meaning."  In the Matter of the Board of Higher Education v. Carter, 14 N.Y.2d 138, 143, 250 N.Y.S.2d 33 (1964) ["The New York State Temporary Commission against Discrimination, agency created by chapter 692 of the Laws of 1944, in a report which contained the proposed statutory text and a study of the problem of discrimination and its background … noted that: 'We have found no definition of the word 'employer' as clear and comprehensive as the word itself in its accepted and dictionary meaning'"].

The New York courts have analyzed the following four (4) common law elements in determining whether an entity is an "employer" within the meaning of the HRL:

    (1)    Whether the purported employer has the power of the selection and engagement of the employee;

    (2)    Whether the purported employer pays the salary or wages to the employee;

    (3)    Whether the purported employer has the power of dismissal over the employee; and

> (4) Whether the purported employer has the power to control the
> employee's conduct.

Houston v. Fidelity (National Financial Services), 1997 U.S. Dist. Lexis 2366, *34 (S.D.N.Y.
1997); Goyette v. DCA Advertising Inc., 830 F.Supp. 737, 746 (S.D.N.Y. 1993); State Division
of Human Rights v. GTE Corp., 109 A.D.2d 1082, 487 N.Y.S.2d 234, 235 (4th Dept. 1985).

 The most important factor in determining who is an "employer" is control over
the employee's conduct.  In re Villa Maria Institute of Music v. Ross, 54 N.Y.2d 691, 442
N.Y.S.2d 972, 973 (1981); Gemakian v. Kenny Int'l Corp., 151 A.D.2d 342, 543 N.Y.S.2d 66,
67 (1st Dept. 1989) [employer's control over employee's conduct is essential element to
employer-employee relationship under HRL].

 In Goyette v. DCA Advertising Inc., 830 F.Supp. 737, 746 (S.D.N.Y. 1993),
employees of DCA Advertising, the U.S. subsidiary of a Japanese company Dentsu, Inc., sued
DCA and Dentsu for alleged violations of Title VII of the Civil Rights Act of 1964 and the New
York HRL for alleged discrimination between its American and Japanese employees.  The parent
company, Dentsu, had a policy of not firing Japanese employees until a new job was found for
them in Japan.  Dentsu argued that it was not an employer of the American plaintiffs within the
meaning of the HRL.  Although the Court found that Dentsu was an employer of DCA's
employees for Title VII purposes, the Court ruled that Dentsu was not their employer under the
New York HRL.

 Applying the above-cited four-part test, the District Court determined that Dentsu
only had power of selection over the Japanese, not the American, expatriates.  Dentsu could veto
the dismissal of Japanese expatriates and it subsidized their salaries, but Dentsu had no control
over who was hired to fill DCA's American positions and Dentsu could not fire DCA employees.

DCA paid all of its employees' salaries and Dentsu had no involvement in the day-to-day control over the conduct of DCA's employees. Id. at 746-747.  Accordingly, the Court granted Dentsu summary judgment with respect to the plaintiffs' HRL claims.

In Houston v. Fidelity (National Financial Services), 1997 U.S. Dist. Lexis 2366 (S.D.NY. 1997), the plaintiff filed an action against his employer NFS, its parent company FMR and his individual supervisors alleging age and race discrimination.   He averred that the defendants violated Title VII, the Age Discrimination in Employment Act (ADEA) and the New York HRL. Id. at *3-4.

The plaintiff's employer NFS and its parent company FMR were separate entities, but plaintiff established that NFS's personnel decisions were ultimately made by the parent company FMR.  Id. at *34-35.  For instance, NFS could not fire its Human Resources Director without FMR's approval; NFS's personnel handbooks and documents were generated by FMR; NFS had to obtain approval from FMR before interviewing candidates for open positions.  All NFS's bookkeeping was done by FMR, including establishing salary lines for NFS employees and all NFS employee terminations had to be reviewed and approved by FMR.  Id.

The District Court held there was a triable issue whether the parent company FMR was the plaintiff's "employer" under Title VII and the ADEA.  Id. at *36.  Significantly, however, the Court held that FMR was not the plaintiff's "employer" under the New York HRL's narrower definition.  Id. at *37.  The Court found that FMR did not have power over the selection and hiring of NFS employees, FMR did not pay salaries to NFS employees, FMR did not have general power of dismissal over NFS's workforce and, most importantly, FMR did not exercise day-to-day control over the conduct of NFS's employees.  Id. at *37-38.

16

See also Robins v. Max Mara, U.S.A., Inc., 923 F. Supp. 460, 470-71(S.D. 1998) [holding parent corporation was not "employer" under the HRL as it did not control the subsidiary's employees]; Hirschfeld v. Institutional Investor, Inc., 260 A.D.2d 171, 172, 688 N.Y.S.2d 31, 32 (1st Dept. 1999) ["Likewise, the IAS Court properly dismissed the complaint as to defendants Leonard K. Herman and Capital Cities/ABC, Inc., since plaintiff failed to demonstrate that they had control over her as an employee"]; Brady v. Helmsley, 246 A.D.2d 486, 487, 668 N.Y.S.2d 198, 199 (1st Dept. 1998) ["The cause of action for employment discrimination on the basis of age was properly dismissed as against one of the two corporate defendants in view of the unrefuted documentary evidence, including W-2 forms, demonstrating that plaintiff was employed by, and received his salary only from, the other corporate defendant."]

SIRVA is several times removed from ASTRO and its employees. SIRVA is the parent company of SIRVA Worldwide, which is the parent company or NAVL, which is the parent company of ALLIED. SIRVA has no contractual relationship with ASTRO or its employees. Furthermore, ALLIED's relationship with ASTRO is entirely contractual. The ALLIED/ASTRO Agency Contract explicitly disavows any joint employer relationship between them, which forecloses any conceivable joint employer relationship between SIRVA and ASTRO or its employees. SIRVA has no power over the selection of ASTRO employees, SIRVA does not decide their salaries or benefits and does not pay them. SIRVA has no power of dismissal over ASTRO's employees and SIRVA was not involved in, and does not have power to exercise, day-to-day control over ASTRO's employees. Plaintiffs GRIFFIN and GODWIN admitted in their depositions that they had no contact or communication whatever with SIRVA.

Accordingly, the Complaint should be dismissed as against SIRVA because it was not plaintiffs' "employer" under the HRL.

**B.     ALLIED's Limited Agency Relationship With ASTRO Does Not Create a Joint Employment Relationship Between Them.**

      **(1)     The ALLIED/ASTRO Agency Contract Provides There is No Joint Employment Relationship.**

The relevant Agency Contract (¶3.07) between ALLIED and ASTRO recites that their relationship is that of principal and agent, respectively.  The Contract further explicitly recites that ASTRO's employees are exclusively its own and that there is no "joint employer" relationship between ALLIED and ASTRO with respect to ASTRO's employees.

The Agency Contract is entitled to be enforced as drafted, particularly where plaintiffs fail to produce evidence that they had any contact with ALLIED while they worked for ASTRO.  As with SIRVA, plaintiffs GRIFFIN and GODWIN admitted in their depositions that they had no contact or communication at all with ALLIED.

      **(2)     ALLIED is Not an "Employer" Under the HRL.**

Applying the four (4) New York HRL "employer" criteria to ALLIED's relationship with ASTRO irresistibly leads to the conclusion that ALLIED was not plaintiffs' "employer."  Under the ALLIED/ASTRO Agency Contract, ASTRO acts as ALLIED's limited disclosed household goods agent only for interstate moves.  ASTRO operates under its own New York authority for intrastate moves and as a local warehouseman.  ASTRO conducts its own business, outside of its limited agency relationship with ALLIED, with ASTRO's own customers.

Apart from ALLIED's CLP rules requiring ASTRO and other agents to provide screened, qualified drivers and helpers for ALLIED's interstate shipments, ALLIED has no

control over ASTRO's employees.  ALLIED does not: (1) control the selection and hiring of ASTRO's employees; (2) determine or pay the salaries of ASTRO's employees; (3) control the day-to-day activities of ASTRO's employees or (4) have the power of dismissal over ASTRO's employees.

In a factually analogous case, a New York trial court held that a mere contracting party cannot be deemed an "employer" under the HRL for merely refusing to work with another contracting party's employees.  In <u>Dinah v. Salzman Electric Co., Inc</u>. 2005 N.Y. Misc. Lexis 3591 (Sup.Ct. Queens Cty. 2005), the plaintiff was employed as an electrician by the defendant Salzman.  Salzman was hired as a sub-contractor by the co-defendant Silverlining Interiors, Inc. Most of Salzman's work was for Silverlining.  While working on a Silverlining project, the plaintiff had an altercation with a Silverlining employee.  Silverlining advised Salzman that the plaintiff could no longer work at Silverlining's job sites.  Eventually, Salzman stopped assigning jobs to the plaintiff.

Plaintiff sued Salzman and Silverlining alleging race discrimination claims under the New York HRL.  Silverlining moved to dismiss the action on the ground that it was not the plaintiff's employer under the HRL.  The Court granted Silverlining's motion, holding that Silverlining had no direct control over the plaintiff's employment by Salzman.  Silverlining did not set the plaintiff's wage, collect taxes, provide insurance or other benefits for the plaintiff.  <u>Id</u>. at *2.

The mere fact that ALLIED's CLP standards disqualify GRIFFIN and GODWIN, and other dangerous felons, from working on ALLIED's interstate shipments does not make ALLIED their "employer."

**(3)    ALLIED is Not Plaintiffs' "Employer" Even
        Under the Broader Federal Law Definition.**

In <u>Dinah</u>, <u>supra</u>, the Court also rejected the plaintiff's contention that the more

expansive Title VII definition of  "employer" should be applied to his claims.   The Court

determined that Silverlining was not a "joint employer" under federal law.   <u>Id</u>. at *7-8.   The

Court held, "<u>Requesting that plaintiff not be sent to any of their project sites, without more, is not</u>

<u>enough to support such a claim</u>" (emphasis added).   <u>Id</u>.

Lawrence v. Adderley Indus., 2011 U.S. Dist. LEXIS 14386 (E.D.N.Y. 2011) is

highly apposite to this case.   There, the plaintiff filed a putative class action against Adderley and

Cablevision alleging violations of the Federal Fair Labor Standards Act and New York Labor

Law.   <u>Id</u>. at *1.   Adderley  performed installation, service and repair work for Cablevision in

residences and commercial buildings under a Standard Installation and Services Agreement

("SIS Agreement").   <u>Id</u>. at *3.   Cablevision was Adderley's only client.

Adderley was required to perform to Cablevision's services in accordance with

Cablevision's procedures and specifications and provide employees trained in accordance with

Cablevision's standards.   <u>Id</u>. at *4.   Cablevision issued Adderley work orders for jobs and the

"appointment windows" during which jobs were to be completed.   <u>Id</u>. at *6.   Cablevision

instructed Adderley as to the equipment required for each job.   <u>Id</u>. at *7.   Cablevision expected

all jobs to be completed by Adderley on the assigned day and tracked the jobs.   <u>Id</u>.   Adderley

controlled which and how many of its employees were assigned to Cablevision jobs.   Adderley's

employees could provide services in addition to those prescribed in Cablevision's work orders,

but they had to obtain a rate code from Cablevision for any such changes.   <u>Id</u>. at *8.   Adderley

employee technicians had to obtain a signed Cablevision acknowledgement form and collect

20

payments from the customers, which the technicians submitted to Adderley for remittance to Cablevision. Id. at *7-8.

Adderley did not require Cablevision's approval to hire a technician, but Adderley had to obtain a Cablevision identification badge for each technician. Id. at *9. Cablevision maintained a list of approved Adderley workers and anyone who was not on that list was not permitted to install Cablevision equipment. Id. Cablevision could remove individuals from the approved list, but Adderley could employ a non-approved technician in other capacities. Id. at 9-10. Significantly, "Cablevision also required Adderley to perform criminal background checks, before hiring a technician…to protect the safety of Cablevision's customers, whose homes Adderley's technicians will be entering, and Cablevision's equipment, to which the technicians have access" (emphasis added). Id. at *10. Cablevision referred customer complaints about technicians to Adderley. Id. at *11. The SIS Agreement gave Cablevision the right to remove any Adderley employee from a Cablevision project, but Cablevision could not require Adderley to fire a technician. Id. Furthermore, Cablevision did not control Adderley technicians' compensation, benefits, discipline or performance. Id.

The District Court held that Cablevision was not a "joint employer" of the plaintiff because it exercised neither actual nor functional control over him. With respect to Cablevision's background check policy, the Court stated:

> Cablevision's drug testing and background-check policy also does not indicate an employee/employer relationship. Rather, it is only good business sense for [Cablevision] to attempt to insure that [the technicians sent to its customers' [homes] are fit to [enter those homes]. Id. at *25-26.

Jacobson v. Comcast Corp., 740 F. Supp. 2d 683 (D.Md. 2010) involved facts analogous to those in Lawrence and the instant case. Comcast required all its contractors'

21

prospective technicians to pass criminal background checks and drug screening tests. Comcast was required to approve all prospective technicians prior to their hiring by the contractors. Comcast had authority to revoke a contractor's technician's "authorized contractor" status and prohibit him from doing work for Comcast. Such action by Comcast effectively terminated a contractor technician because only contractors performed work for Comcast.

The District Court held that Comcast was not the plaintiff's employer. The Court reasoned that, although Comcast "unquestionably plays a role in hiring and firing technicians[,] …[i]t is only in the context of quality control …that Comcast exercises power over the hiring or firing of technicians" (emphasis added). Id. at 689-90.

The Court further held, in relevant part:

> [Contractors] are free to hire anyone they choose to hire, provided that the applicants do not have a criminal record or fail a drug test. Likewise, a [] [Contractor] has full authority to maintain the employment of the technicians, provided that a technician meets Comcast's quality performance standards, and to fire any technician that it believes should be fired, even if the technician meets Comcast's quality control standards. Id. at 690.

Jacobson also found significant:

> … that the control Comcast does exercise is in part designed to protect Comcast customers. …Technicians enter the residences of Comcast customers to perform installations. …Comcast's quality control procedures ultimately stem from the nature of their business and the need to provide reliable service to their customers, not the nature of the relationship between the technicians and Comcast. While Comcast's supervision and control may appear substantial in degree, it is qualitatively different from the control exercised by employers over employees. (emphasis added). Id. at 691-92.

As in Lawrence and Jacobson, ALLIED's CLP standards are designed to protect ALLIED's customers and their families in their homes and businesses where ALLIED's

interstate transportation services are rendered.  ASTRO's helpers enter the homes of ALLIED's customers to pack and move their property.  ALLIED's labor quality control rules stem from the need to provide safe and reliable service to its customers and their families.  ALLIED's rules, however, do not make it an "employer" of its disclosed household goods agents' contractors and employees by any stretch.

The Complaint should be dismissed against SIRVA and ALLIED on the ground that neither was an "employer" of plaintiffs within the meaning of the New York HRL or federal law.

### POINT III

**IF SIRVA OR ALLIED WAS AN "EMPLOYER,"
THEY ARE JUSTIFIED IN EXCLUDING
PLAINTIFFS FROM CUSTOMERS' HOMES**

Even if the Court determines that ALLIED's interstate transportation services and related CLP standards are governed by New York law, SIRVA and ALLIED did not violate Corrections Law §752.  That is because the assignment of interstate jobs to GRIFFIN and GODWIN, respectively, convicted of first-degree sexual abuse and rape of a 7-year old boy and a 7-year old girl, would involve an unreasonable risk to the safety and welfare of the general public, particularly children who are their preferred victims.

In Bonacorsa v. Van Lindt, 71 N.Y.2d 605, 528 N.Y.S.2d 519 (1998), the New York Court of Appeals held that "if there is direct relationship between the criminal offense and the specific license or employment sought…or where the license or employment would involve an unreasonable risk to persons or property…the employer has discretion to deny the license or employment." Id. at 612 (emphasis added).  If the employer weighs all the eight (8) Section 753 properly, the employer's decision cannot be overruled unless it is arbitrary and capricious.  Id. at

23

615.  See also, <u>Arrocha v. Board of Educ. of City of New York</u>, 93 N.Y.2d 361, 690 N.Y.S.2d 503 (1999) ["there is no justification for overturning the Board's determination without engaging in essentially a re-weighing of the factors, which is beyond the power of judicial review."]

ALLIED's Adjudication Guidelines require that applicants with felony convictions for: (A) sexual offense; (B) kidnapping; (C) death-related offenses; (D) attempted murder; (E) assault with a deadly weapon; (F) assault with intent to kill or (G) armed robbery be disqualified from moving jobs performed by its disclosed household goods agents under ALLIED's interstate authority.

In establishing its Adjudication Guidelines, ALLIED considered numerous relevant factors, including but not limited to: (A) the seriousness of an applicant's crime(s); (B) possible rehabilitation of the applicant since the crime(s); (C) the safety of ALLIED's customers and their families; (D) the potential legal liability of and business impact on, ALLIED if an agent's contractor or employee with a known or unknown criminal background commits a crime against an ALLIED customer; (E) whether ALLIED's customers would consent to having persons with dangerous criminal histories enter their homes if informed about them; (F) ALLIED's potential legal duty to disclose to its customers any use of persons convicted of dangerous crimes as drivers, packers or helpers in their homes or businesses; (G) the high probability of repeat crimes being committed by dangerous sex offenders[2]; (H) the shortage of

_____

[2] The Supreme Court of Wisconsin noted in <u>County of Milwaukee v. Labor & Industry Review Comm'n</u>, 139 Wis. 2d 805. 821,n.3 (Sup. Ct. Wisc. 1987):

> Recidivism is often undetected. One study focusing on rape and child molestation drew the following conclusions:
>
> "The findings suggests that contrary to the impression yielded by the general literature, such offenders are serious recidivists. It

available labor in the moving industry and (I) the public policy of some states to encourage employment of rehabilitated criminals.

ALLIED substantially considered the Section 753 criteria in establishing its CLP standards. See, In the Matter of Formica Construction, Inc. v. Mintz, 65 A.D.3d 686, 688; 885 N.Y.S.2d 298, 300 (2nd Dept. 2009) [vacating trial court order requiring Board to grant Formica's application and stating Board "must first consider all of the factors set forth in Correction Law…and then make a new determination. Thus, the Supreme Court should have remitted the matter to the [Board] for consideration of the statutory factors and a new determination of the application to renew the…license"]; Gallo v. State Office of Mental Retardation and Developmental Disabilities, 37 A.D.3d 984, 986, 830 N.Y.S.2d 796 (3d Dept. 2007)[matter remanded for Office of Mental Retardation to review all Section 753 factors when it failed to properly address all factors in its employment decision]; Black v. New York State Office of Mental Retardation and Development Disabilities, 20 Misc.3d 581, 587 858 N.Y.S.2d 859, 864 (Sup. Ct. 2008)[ same effect].

ALLIED has evaluated the eight (8) Section 753 factors and they overwhelmingly weigh in favor of excluding plaintiffs GRIFFIN and GODWIN from working in the homes and

---

would appear from this study that sexual offenders avoid detection approximately twice as often as they are apprehended for their crimes. The rapists, who had an average of three rape convictions on record, and the child molesters, who averaged two convictions on record, admitted to an average of five similar offenses for which they were never apprehended. It can be reasonably assumed that this is at best a very conservative estimate of the actual undetected recidivism among these inmates." Groth, Longe & McFadin, Undetected Recidivism in Rapists and Child Molesters, 28 Crime & Delinquency 450, 456 (1982).

businesses of ALLIED's customers. Allowing child rapists like plaintiffs to enter ALLIED's customers homes creates an unacceptable high degree of risk for ALLIED's customers. ALLIED's assessment of the eight (8) factors is as follows:

      (A)    New York's public policy to encourage employment of persons convicted of criminal offenses weighs in plaintiffs' favor;

      (B)    The duties and responsibilities of a mover helper would require plaintiffs to enter customers' homes or businesses to do packing, moving and loading tasks in close proximity with their families, including children, and employees;

      (C)    There is a direct relationship between plaintiffs' serious sex crimes against small children and the job duties of persons who perform services on ALLIED's interstate moves in homes where they would likely come into unsupervised contact with the children of unsuspecting customers;

      (D)    GRIFFIN was imprisoned for ten (10) years and GODWIN for seven (7) years, but they have produced no evidence of their rehabilitation;

      (E)    GRIFFIN was 31 years old and GODWIN was 29 years old when they raped and molested 7-year old children;

      (F)    The seriousness of GRIFFIN's and GODWIN's crimes is self-evident and beyond dispute;

      (G)    Evidence of GRIFFIN's and GODWIN's rehabilitation is scant or non-existent as they are still registered sex offenders. GRIFFIN must report to the police every ninety (90) days. Plaintiffs have no certificates of good conduct or relief from disabilities. Under Corrections Law article 6-C(i), the Sex Offender Registration Act, GRIFFIN's risk level designation is "3" indicating he represents a high risk of repeat offense. GODWIN is designated

26

as a risk level "2" which means he is a moderate risk for a repeat offense. <u>People v. Wyatt</u>, 931

N.Y.S.2d 85, 88 (2nd Dept. 2011) ["The applicable point ranges in the scoring system are: 0 to

70, level one (low); 75 to 105, level two (moderate); and 110 to 300, level three (high)"].   The

risk assessment is determined by a:

> Board, which consists of members who are "experts in the field of
> the behavior and treatment of sex offenders," …The Board must
> apply the Guidelines "to make a recommendation to the sentencing
> court," providing for one of three levels of notification "depending
> upon the degree of the risk of re-offense by the sex offender"
> (Corrections Law § 168-*l* [6]). <u>Id</u>.

(H)     New York has determined that GRIFFIN poses a <u>high</u> risk and GODWIN

a moderate risk of repeat offenses.   ALLIED has a legitimate interest in preventing them from

entering customers' homes because it would create an unreasonable risk of harm to the public

served by ALLIED, and to ALLIED's business and reputation.

In <u>County of Milwaukee v. Labor & Industry Review Comm'n</u>, 139 Wisc. 2d 805.

821 (Sup. Ct. Wisc. 1987), the Wisconsin Supreme Court held under a statute similar to New

York's:

> It is evident that the legislature sought to balance at least two
> interests. On the one hand, society has an interest in rehabilitating
> one who has been convicted of crime and protecting him or her
> from being discriminated against in the area of employment.
> Employment is an integral part of the rehabilitation process. On the
> other hand, society has an interest in protecting its citizens. <u>There
> is a concern that individuals, and the community at large, not bear
> an unreasonable risk that a convicted person, being placed in an
> employment situation offering temptations or opportunities for
> criminal activity similar to those present in the crimes for which he
> had been previously convicted, will commit another similar crime.
> This concern is legitimate since it is necessarily based on the well-
> documented phenomenon of recidivism</u> (emphasis added). <u>Id</u>. at
> 821.

27

Courts in other jurisdictions with laws like New York's at issue herein have found dismissal of an employee proper under similar circumstances. In <u>Cisco v. United Parcel Services, Inc</u>., 328 Pa. Super. 300, 476 A.2d 1340 (Pa. Super. 1984) the plaintiff was a UPS employee who was charged with theft and trespass for an incident that allegedly occurred while he was making a delivery. <u>Id</u>. at 1341. Prior to the plaintiff's acquittal, UPS compelled him to resign because of the charges. <u>Id</u>. The plaintiff relied on 18 Pa. Cons. Stat. § 9125 which states, "Felony and misdemeanor convictions may be considered by the employer only to the extent to which they relate to the applicant's suitability for employment in the position for which he has applied."

The Pennsylvania appeals court affirmed the lower court's dismissal of the action. The Appellate Division held:

> Thus, ...jobs are lost when the employer, for a legitimate business reason, cannot risk even someone under suspicion of having committed theft and trespass when the nature of its business is to enter onto the premises of others and to deliver parcels which belong to them. Thus, our survey of the applicable case law constrains us to affirm the order of the lower court which dismissed his complaint. We have concluded that a plausible and legitimate reason for appellant's discharge existed in that his employer was protecting its reputation by discharging an employee who was accused of theft and trespass in connection with his employment, even though a jury ultimately acquitted him. <u>Id</u>. at 308.

See also, <u>Mallette v. United States Sec. Assocs</u>., 2008 U.S. Dist. LEXIS *8,*9 (E.D.Pa. 2008)["Mallette was hired to work as a security guard at St. Christopher's, a children's hospital, where he came into constant contact with young patients and the families of those patients. As such, the safety and welfare of many individuals rested in his hands...Under the circumstances, USSA acted reasonably in suspending Mallette without pay when it learned that he had multiple violent charges pending against him, some of which were felonies."]; <u>Moses v. Browning-Feris</u>

28

Industries of Kansas City, Inc. 1986 U.S. Dist. LEXIS 20073, *8-9 (D. Kan. 1986) [" the court finds that use of an applicant's criminal past [rape and robbery] in determining qualifications for employment is justified by business necessity. Waste disposal workers come in close contact with the public many times during the day. The helpers occasionally have to enter a person's yard or even the front porch in order to pick up refuse. That the defendant reasonably sought workers with a clean criminal record is understandable given the great potential for liability in the event of misconduct"].

ALLIED's CLP criteria and Adjudication Standards comply with New York law and justify the disqualification and exclusion of GRIFFIN and GODWIN from ALLIED's interstate moving services to the public, services that require ALLIED's agents' workers to work unsupervised in close proximity to vulnerable persons. While New York's policy to encourage employment of persons with criminal convictions generally favors plaintiffs, all other pertinent factors weigh against them.   GRIFFIN and GODWIN do not have actionable claims against SIRVA and ALLIED under Executive Law § 296 and Corrections Law § 752 and those statutes do not authorize or support any award of monetary damages in favor of plaintiffs in this action.

## CONCLUSION

The Complaint against defendants SIRVA, INC. and ALLIED VAN LINES, INC. ("ALLIED") should be dismissed with prejudice in its entirety.

Dated:  September 10, 2012

George W. Wright
GEORGE W. WRIGHT

29