1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                    :
                                    :
TRATHONY GRIFFIN, MICHAEL           :11-CV-1844 (MKB)
GODWIN, and FRANK CALLACE,          :
                                    :
         Plaintiffs,                :
                                    :United States Courthouse
                                    :Brooklyn, New York
    -against-                       :
                                    :
                                    :Thursday, November 20, 2014
                                    :9:30 a.m.
SIRVA, INC.; ALLIED VAN             :
LINES, INC.; and ASTRO MOVING       :
AND STORAGE CO., INC.,              :
                                    :
         Defendants.                :
                                    :
- - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE MARGO K. BRODIE
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Plaintiff:   LICHTEN & BRIGHT, P.C.
                        475 Park Avenue South
                        17th Floor
                        New York, New York 10016
                     BY:  STUART LICHTEN, ESQ.

For the Defendant:   ALBANESE & ALBANESE LLP
Astro Moving and        1050 Franklin Avenue
Storage Co, Inc.        Suite 500
                        Garden City, New York 11530
                     BY:  HYMAN HACKER, ESQ.
                        JOHN E. SCHAEFER, JR., ESQ.

Court Reporter:      SHERRY J. BRYANT, RMR, CRR
                        225 Cadman Plaza East
                        Brooklyn, New York 11201
                        **sbryant102@verizon.net**

Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

1          (In open court.)

2          THE COURT:  Are we ready to proceed, Counsel?

3          MR. HACKER:  Yes.

4          MR. LICHTEN:  Yes.

5          THE COURT:  Please bring in the jury.

6          (Jury enters courtroom.)

7          THE COURT:  Good morning, ladies and gentlemen.

8   Thank you for being on time.  We're going to continue the

9   trial.  Counsel, please call your next witness.

10         MR. HACKER:  We call Laura Smith.

11         (Witness sworn.)

12         COURTROOM DEPUTY:  Could you please state and spell

13  your name for the record.

14         THE COURT:  Have a seat and pull the mic to you.

15         THE WITNESS:  Laura Smith.

16         THE COURT:  You can pull the mic to you.  Please

17  proceed, Counsel.

18  **LAURA SMITH**,

19  called by the Defense, having been first duly sworn, was

20  examined and testified as follows:

21  DIRECT EXAMINATION

22  BY MR. HACKER:

23  Q    Good morning, Ms. Smith.

24  A    Good morning.

25  Q    Are you currently employed by Astro Moving and Storage?

SMITH - DIRECT / HACKER                3

1    A    Yes, I am.

2    Q    And how long have you been employed there?

3    A    Twenty-two years.

4    Q    And what is your present position?

5    A    Bookkeeper, office manager.

6    Q    And have you had that position all those years?

7    A    Bookkeeper for most of it.  Office manager for about the

8    last three.

9    Q    Okay.  And what role, if any, do you have with respect to

10   employees' payroll matters?

11   A    The only time I ever had anything to do with payroll is

12   if an additional check needed to be cut for additional hours

13   may be due somebody.  We would cut a payroll exchange check.

14   Q    Can you explain when that would happen that there would

15   be additional hours?

16   A    If someone got their check and was -- you know, thought

17   that the hours were wrong, they would see Keith in dispatch.

18   And then he would look through the daily sheets.  They would

19   go over it.  If he was due additional hours, then it would be

20   submitted to me as a check request for the additional time.

21   Q    Okay.  Then what would you do?

22   A    I would cut a check and do it immediately and give it to

23   the driver or helper.

24   Q    So would it be put into the next week's payroll?

25   A    No, no.

1  Q    It would be before that; is that right?

2  A    Yes, always right that same day.

3  Q    How often did it happen that there were extra checks that

4  had to be cut because of an error in the initial payroll?

5  A    We might have it once a month.  I mean, it's not an often

6  thing that happened all the time.

7  Q    All right.  So on another front, you've worked there for

8  22 years; is that right?

9  A    Yes.

10  Q    And how long has Mr. Keith Verderber been there?

11  A    As long as I've been there.

12  Q    So you know him a long time?

13  A    Yes.

14  Q    In all the years you've been there, have you heard Keith

15  Verderber shout racial curses at any of the African-American

16  or Hispanic employees at Astro?

17  A    No, never.

18  Q    Never?

19  A    No, huh-uh.

20  Q    Well, the jury is looking at you.  Is it possible that

21  because --

22            THE COURT:  Counsel.  Counsel, ask your questions.

23            MR. HACKER:  I am.

24            THE COURT:  No comments, please --

25            MR. HACKER:  I'm asking.

1        THE COURT:  -- as to what the jury is doing.

2    Q    Is it possible that one would -- that you might not be

3    sensitive to those comments because you're white?

4        MR. LICHTEN:  Objection, "possible."

5        THE COURT:  Sustained.

6    Q    Are you sensitive to racial comments?

7    A    Yes, I would be sensitive to racial comments.

8    Q    And why is that?

9    A    Because my son is half black.  It would bother me.

10   Q    And who's the father of the child?

11   A    Ronald Hardy.

12   Q    And is he related in any way to Astro Moving and Storage?

13       THE COURT:  Sustained.  Next question, Counsel.

14   Q    Is Ronald Hardy a former employee?

15       THE COURT:  Next question, Counsel.  Move on.

16       MR. HACKER:  I have no other questions.

17       THE COURT:  Cross-examination.

18       MR. LICHTEN:  Yes.  Can the witness be shown the

19   defendant's exhibit list, defendant's exhibits?

20       THE COURT:  You can ask her anything about them that

21   she happens to know about.

22   CROSS-EXAMINATION

23   BY MR. LICHTEN:

24   Q    Could you look at what's been marked Defendant's Exhibit

25   A.  Do you see Defendant's Exhibit A?

1  A    In this book?

2  Q    Yes.  It's actually 1 in the book.

3  A    Okay.  First page you're talking about?

4  Q    Well, the whole exhibit.  Are you familiar with that type

5  of document?

6  A    Yes.

7  Q    What is it?

8  A    It's a daily sheet.

9  Q    You mentioned in your direct testimony the daily sheets.

10 These are the daily sheets; is that right?

11 A    Yes, it's a daily sheet.

12 Q    Do you, as part of your job, look at the daily sheets and

13 put the number of hours each employee worked into --

14 A    No.

15 Q    Have you ever in your job, in your 22 years at Astro,

16 dealt with the daily sheets?

17           MR. HACKER:  Objection, vague question.  "Dealt

18 with."

19           THE COURT:  Objection is overruled.  You can answer

20 the question.

21 A    The only time I deal with it is when I'm -- I settle out

22 owner-operators as part of my job, and I go to the daily sheet

23 to see if a local driver or helpers were sent out to load a

24 shipment, to see if the driver needed to be charged a Rule 19.

25 Q    How are the time for Astro employees kept?  Are those

SMITH - CROSS / LICHTEN                      7

1   time sheets the time records for Astro employees?

2   A    I don't know.  I don't do payroll.

3   Q    Do you know is there a punch clock at Astro?

4   A    Yes.

5   Q    And what workers use the punch clock?

6   A    The office.

7   Q    And who would work in the office?

8   A    Myself, dispatch, girls in accounting, solicitation.

9   Q    Are you paid hourly?

10  A    Yes.

11  Q    Do you use the punch clock?

12  A    Yes, I do.

13           MR. HACKER:  Objection, it's beyond the direct.

14           THE COURT:  Overruled.  It's overruled, Counsel.

15           MR. LICHTEN:  I have nothing further.

16           THE COURT:  Is there anything else?

17           MR. HACKER:  No, Your Honor.

18           THE COURT:  You're excused.

19           THE WITNESS:  Thank you.

20           THE COURT:  Is there another witness, Counsel?

21           MR. HACKER:  No, Your Honor.  We rest.

22           THE COURT:  Okay, ladies and gentlemen.  So both

23  sides have rested.  It means that the only thing left in the

24  case is for the parties to make their summation arguments to

25  you as to what they believe the evidence shows and for me to

1  charge you.  Right now, we still have to, myself and the

2  parties, discuss the charge that I will give to you.  So we're

3  not ready to move forward with summations yet.  If I had known

4  this witness would have been so short, I would have had you

5  come in later today.

6         So you're going to have a break.  It is now almost

7  10:30, so we probably won't be ready to go until 12.  So

8  you're going to have an hour-and-a-half break.  You can leave.

9  All I ask is that you come back by 12 and we'll be ready to go

10  then.  Okay?  I apologize for the inconvenience.

11         (Jury exits courtroom.)

12         THE COURT:  With regard to the overtime wages, my

13  understanding is that plaintiffs have to prove their case as

14  to whether or not they're entitled to overtime; and the

15  defendant then has to prove whether or not plaintiffs are

16  loaders, as they claim, as an affirmative defense.  Am I wrong

17  about that?

18         MR. LICHTEN:  I don't believe so.  I believe Your

19  Honor is right.

20         THE COURT:  The charges you proposed, Counsel, which

21  is why I'm asking, is that that determination has to be made

22  first.  But I believe this exemption is asserted as an

23  affirmative defense, which means plaintiffs have to first

24  prove their claim, and then if the jury finds that there is a

25  claim they then have to consider whether or not they fit under

1   the exception.  Counsel?

2            MR. HACKER:  That's what I would understand, yes.

3            THE COURT:  If you look on page 1, at the bottom of

4   your charge, continuing into 2, Counsel, you suggest that the

5   jury needs to first find the issue as to whether or not they

6   even fit.  I thought it was the other way around.

7            MR. LICHTEN:  Well, I don't say that the burden is

8   on the plaintiff.

9            THE COURT:  It's not a burden issue.  So as an

10  affirmative defense, my understanding is plaintiff has to

11  prove first, and it's only if the jury finds that that they

12  then even get to that issue.

13           MR. LICHTEN:  Okay.  I don't --

14           THE COURT:  Okay.  Well, I'm going to finish working

15  on the charges now.  I should have it for the parties in half

16  an hour.  It's 10:30.  I should have it for you by 11 or

17  shortly after 11, and I'll give it to the parties and give you

18  some time to review it before we discuss it.  Okay?

19           MR. HACKER:  That's fine.  Thank you.

20           (Recess.)

21           (In open court outside the presence of the jury.)

22           THE COURT:  Okay.  Have the parties had a chance to

23  review the draft charges?

24           MR. LICHTEN:  Yes.

25           MR. HACKER:  Yes, Your Honor.

1        THE COURT:  I'll hear comments from both sides,

2   starting with you, Counsel.

3        MR. LICHTEN:  Your Honor, plaintiffs have two

4   objections to the Court's draft jury instruction.  The first

5   has to do with page --

6        THE COURT:  Just tell me what page.  You can sit,

7   Counsel, and turn your mic on.  I think your mic is off.  Is

8   the green light on?  There you go.  What page number?

9        MR. LICHTEN:  Seventeen.

10        THE COURT:  Go ahead.

11        MR. LICHTEN:  The first full paragraph states:  "It

12   is your responsibility to determine if plaintiffs have proven,

13   by a preponderance of the evidence, that defendant

14   unreasonably terminated their employment based upon their

15   criminal convictions.  You are to consider if the decision

16   made by defendant was reasonable in light of the statutory

17   factors to be considered, not whether you personally would

18   have made the same decision."

19        Now, I'm not -- plaintiffs are not sure where that

20   unreasonable defense is found.  It's not in the statute.

21   Section 752 --

22        THE COURT:  I'm sorry, which part of this are you

23   complaining about?

24        MR. LICHTEN:  The part that says the defendant has

25   to have unreasonably terminated the employment and it has to

1   be reasonable, not whether you personally would have made the

2   same decision.  In other words, it can be a different decision

3   and still not have violated the statute.  I think the statute

4   merely says that no employment shall be denied by reason of an

5   individual having been previously convicted of one or more

6   criminal offenses unless there is a direct relationship or

7   unless there's an unreasonable risk to property.

8            THE COURT:  So what do you believe this paragraph

9   should say?

10           MR. LICHTEN:  I think particularly the second

11  sentence but more likely, more probably the whole paragraph

12  should just be eliminated.  The question is whether the jurors

13  personally would have made the same decision, and the jurors

14  are deciding whether discrimination occurred here, not whether

15  it was reasonable or not.

16           THE COURT:  No, they're not deciding based on their

17  own views whether or not discrimination occurred here.

18  They're deciding whether or not discrimination occurred, based

19  on the law and reviewing these facts.

20           MR. LICHTEN:  I believe this standard comes from the

21  Article 78 proceedings where a public agency is given the

22  benefit of the doubt, and you cannot prove an Article 78

23  violation unless you show that it was arbitrary or capricious

24  or unreasonable.  There could be more than one decision that

25  could be reasonable.

1          THE COURT:  Correct, but it's the same statute being

2     applied.  The only reason this statute, as far as I know --

3     and I do recall conducting extensive research on this --

4     hasn't really -- at least it hasn't been enforced and there

5     are no reported cases with regard to private entities.  So the

6     issue is what exactly is the standard for a private entity and

7     is it any different than the standard as applied to the public

8     agencies.

9          MR. LICHTEN:  Right.  And I think it should be

10    different than the standard applied to public agencies.

11         THE COURT:  Well, how should it be different?  Are

12    you saying that a private individual's conduct shouldn't be

13    reviewed for reasonableness or there shouldn't be any standard

14    at all?  It's just whether or not a jury believes that they

15    didn't meet these factors?

16         MR. LICHTEN:  Correct.  Whether or not the jury

17    believes that the individual was fired for his criminal

18    conviction, even given the exceptions.  They can find there

19    was a direct relationship, then they can find that the statute

20    wasn't violated.  If the jury finds that there was an

21    unreasonable risk to the safety of the public, then they can

22    find that the statute wasn't violated.

23         But there's no -- I mean, as Your Honor said in

24    footnote 13 of the decision in this case on the summary

25    judgment, this action is against a private employer and,

1    therefore, not subject to arbitrary and capricious review.

2              THE COURT:  Right.

3              MR. LICHTEN:  I mean to say that a reasonable

4    decision, whichever way it goes, is similar to saying it has

5    to be arbitrary and capricious to be overturned, it has to be

6    unreasonable to be overturned.

7              I don't think there can be more than -- there's only

8    one right answer.  Either the defendants -- either the

9    defendants discriminated against the plaintiffs or they

10   didn't, not whether their actions were reasonable under the

11   circumstances.  Then a juror could find either that they

12   did -- they could have fired them or they could not have fired

13   them.  Both could be reasonable under this standard.

14             THE COURT:  I'm not sure I'm fully following you,

15   Counsel, but give me a minute, let me just re-read this part

16   of the charge again.  And I'll hear from the defendants on

17   this also.  I'm re-reading from page 16, so just give me a

18   minute.  (Pause.)

19             Okay, I will take that paragraph out.  I believe you

20   are correct, that the only issue is whether or not there

21   was -- which is what I believe defendants are claiming -- a

22   direct relationship between the convictions of the defendants

23   and their job -- the plaintiffs, I'm sorry, and their job

24   responsibilities.

25             MR. HACKER:  Your Honor.

1           THE COURT:  Yes.

2           MR. HACKER:  Do you want my comment?

3           THE COURT:  Sure.

4           MR. HACKER:  I think that, if anything, maybe the

5    second sentence is confusing to a juror, could come out.  But

6    I think the first sentence or, in fact, even the second

7    sentence, if you ended at the word "considered" and take off

8    the not -- whether you personally would have -- in other

9    words, if you simply -- because after all, the whole idea is

10   that you've given them the factors and now the question is,

11   was there a reasonable determination, based on these factors.

12           So when you say determine if it's unreasonably

13   terminated, you're I think applying to the factors right

14   above, that's the way it would be understood, and you are to

15   consider if the decision made was reasonable in light of the

16   statutory factors to be considered.  That's exactly right.  I

17   think that's clear and it's helpful to the jurors.

18           I understand not really personally would have made

19   the same decision perhaps is unnecessary so, you know, perhaps

20   a surplus, but I don't think it should come out because it

21   sort of summarizes after the factors, now what?

22           So that would be my comment.

23           THE COURT:  It's telling them that they have to find

24   whether or not there's a direct relationship between the prior

25   conviction and their employment.  I could, instead of this

1   paragraph, say if you find that there was a direct

2   relationship between -- because that is really the finding

3   that we're asking them to do -- that there was a direct

4   relationship between plaintiffs' prior convictions and their

5   specific job duties then you must find for defendant.

6           And then I'll add the other sentence, which says:

7   If, however, you find there was no direct connection between

8   plaintiffs' prior convictions and their specific job duties,

9   you must find for plaintiffs.  And this way, I'm not

10  qualifying what the finding needs to be, simply telling them

11  what the law is and telling them that they have to make the

12  finding.  Okay?

13          And I'm sorry, on page 16, that one sentence right

14  after the block quote, that needs to be moved to the

15  second-to-last paragraph on page 17 at the beginning.  That

16  second-to-last paragraph currently reads:  "If you find that

17  Plaintiff Griffin was not terminated but that he quit

18  voluntarily."  I'm going to put that sentence, "Defendant

19  contends that it did not terminate Plaintiff Griffin," at the

20  beginning of that paragraph.  Okay?

21          Tell me your next objection, Counsel.

22          MR. LICHTEN:  The next objection is an instruction

23  that is not in the draft charges but that should be.  Given

24  that counsel for Astro elicited testimony from Mr. Verderber

25  that Allied -- that Astro was a subsidiary of Allied and then

1  that Astro and Allied had a franchisee-franchisor

2  relationship, I think the jury should be instructed that

3  Allied is a separate company; and on top of that, they should

4  be instructed in accordance with the request that I made of

5  the Court.  Requirements, preferences or attitudes of Astro's

6  clients or customers, such as Allied Van Lines, Inc. or Sirva

7  Inc., are not a defense to a discrimination claim.

8          THE COURT:  Let me make sure I understand the

9  argument you're making.  You're suggesting that because

10  there's testimony of a close relationship or some relationship

11  between Astro and Allied and there's been testimony that

12  Allied is the company that required the background check that

13  it needs to be clarified to the jury that, in fact, they're

14  two separate companies?

15          MR. LICHTEN:  Allied -- according to the testimony

16  of Mr. Verderber, Allied required him to remove these two

17  plaintiffs from all Allied jobs.  And he also said that,

18  essentially, Astro is part of Allied.  He used different

19  language, that they're a subsidiary, they represent Allied,

20  they are Allied, it says Allied on the trucks.

21          And the jury could find that if Allied really is the

22  parent company of Astro, then they really had no choice but to

23  fire these two individuals because they were getting an order

24  that they could not comply with.

25          But it's not a defense -- the reality of the

1  situation is that Astro is an agent of Allied.  It's a

2  separate company.  It has a contractual relationship with

3  Allied.  But what Allied wants them to do is not a defense if

4  what Allied wants them to do is unlawful.  And I think there

5  are cases that say that and that --

6              THE COURT:  What's the page number of your charge

7  that you're referring to, Counsel?

8              MR. LICHTEN:  It's the next-to-last page, the last

9  at the bottom.

10             THE COURT:  The paragraph that starts that

11  requirements, preferences or attitudes of Astro's clients --

12             MR. LICHTEN:  Correct.

13             THE COURT:  -- are not a defense to the

14  discrimination claim?

15             MR. LICHTEN:  Right.

16             THE COURT:  What is defendant's position on this?

17             MR. HACKER:  The first part that he was separating

18  the two entities, I don't think it's necessary.  I thought his

19  cross-examination was quite effective to make it clear that

20  Mr. Verderber didn't really understand the legal relation,

21  that it was -- Your Honor even questioned on that and made it

22  clear that it was an agency.

23             THE COURT:  I did, but I don't think there's

24  anything in the record that makes it clear that they weren't.

25  I asked the questions because I did become confused as to the

SHERRY BRYANT, RMR, CRR

1    relationship by the testimony that they're a franchisee.  I

2    understood it to be a contract only because I've reviewed the

3    documents and ruled on a summary judgment motion, but I don't

4    know that the jury understood that.

5              MR. HACKER:  I really don't have a problem with

6    clarifying that if you think it's still unclear.  But this

7    other part, I don't know -- we're not saying that -- I don't

8    think we have said that Astro's -- you know, its principal had

9    this policy and, therefore, notwithstanding anything else,

10   Astro's innocent on this.

11             But that doesn't mean it isn't some sort of a

12   consideration that -- in other words, I think a negative

13   statement here would suggest to the jury that that's, you

14   know, completely irrelevant.  Again, we're not saying it's a

15   defense.  We never did say it was a defense.

16             THE COURT:  Right.  I think what you're really

17   asking me for, Counsel, is an instruction that maybe under the

18   statute an employer is required to comply with the statutory

19   requirements, and that here Astro is plaintiffs' employer or

20   at least they were during the pertinent time.

21             So it's not so much that any relationship with

22   Allied or Sirva isn't a defense.  I mean, they are free to

23   argue, look, because all of our business or substantially all

24   of our business was with Allied, as a practical business

25   matter, we had to comply with their requirements.  That

1   doesn't in any way negate their responsibility under the

2   statute.  I think that's what you're asking for.

3            MR. LICHTEN:  Right.  But if complying with their

4   requirements violates the law, then it violates the law.

5            THE COURT:  And that's the argument that you will

6   make to the jury.  But I can't say to the jury in a charge

7   that any preferences, requirements or -- I'm not sure that I

8   can go that far.  Right?  You have to put it together.  Let me

9   just look at the charge and see how I can change it.

10           At the end of that section, I could insert something

11  along the lines of using the first part of what you have:

12  Requirements, preferences or attitudes of Astro's clients or

13  customers, such as Allied Van Lines or Sirva, Inc., are not

14  relevant to your determination of whether or not defendant

15  complied with its obligation under the statute.

16           MR. LICHTEN:  That's okay.

17           THE COURT:  I think that takes care of the concern

18  of both sides.

19           MR. HACKER:  I would also add principal rather than

20  just customer or client.  I don't think they really were a

21  customer or client.  I don't know if they understand the term

22  "principal," but....

23           THE COURT:  Wait one second.  I told the jury to

24  come back at 2.

25           Okay, is there anything else from you?

1           MR. LICHTEN:  No.

2           THE COURT:  Now, with regard to is the charge clear

3    as you understand it should be for purposes of the Labor Law

4    claims?

5           MR. LICHTEN:  Yes, it's fine.

6           THE COURT:  Okay.  Counsel?

7           MR. HACKER:  We had an objection.  We'd like to add

8    on page 12 at the bottom, the last -- next-to-the-last full

9    paragraph.

10          THE COURT:  So to add to where it says "defendant

11   claims that his helpers are loaders"?

12          MR. HACKER:  Yes, because I think that in addition

13   to the loading duties, we had solicited testimony about the

14   other types of duties that a helper would engage in, such as

15   having to get out of the vehicle when there are traffic

16   situations.

17          THE COURT:  But where's your legal support for --

18          MR. HACKER:  Regulation 782.4(a).

19          THE COURT:  You need to give me a copy of that.  I

20   couldn't find that in the case law.  I utilized the case law

21   to determine when exactly does conduct affect the operation

22   safety, and so that's what I used for purposes of drafting

23   this.

24          MR. HACKER:  I have it right here.

25          THE COURT:  Okay.  And tell me what this regulation

CHARGE CONFERENCE                    21

1    is.

2              MR. HACKER:  I can read it to you.  It says 782.4.

3              THE COURT:  That says what?  That deals with what?

4              MR. HACKER:  It says --

5              THE COURT:  Not the specific regulation, what it

6    says, but what regulation are you citing to?  Is this under

7    the Motor Carrier Act?

8              MR. HACKER:  It's Wage and Hour Division of the

9    Labor Department's regulation.

10             THE COURT:  Okay.

11             MR. HACKER:  Part 782 of the Labor Department

12   regulations.  So that's 29 --

13             THE COURT:  You have to use your mic.

14             MR. HACKER:  I believe the rule is 29 CFR.  I just

15   have it printed out.  It has 782.4, drivers' helpers.  It's

16   the regulation defining what a driver's helper is.

17             THE COURT:  Okay.  And what does the regulation say?

18             MR. HACKER:  This is the middle of the paragraph.

19   It says, amongst the things that are part of what makes what a

20   helper definition:  Dismount when a vehicle approaches a

21   railroad crossing, let the driver close the tracks, some

22   similar --

23             THE COURT:  Sorry, you have to say it slowly and

24   clearly so the court reporter can get it down.

25             MR. HACKER:  Dismount the vehicle when -- "Dismount

1   when the vehicle approaches a railroad crossing and flag the

2   driver across the tracks, and perform a similar duty when the

3   vehicle is being turned around on a busy highway or when it is

4   entering or emerging from a driveway; in case of a breakdown:

5   (1) place flags, flares, and fuses as required by the safety

6   regulations; (2) go for assistance while the driver protects

7   the vehicle on the highway, or vice versa; or (3) assist the

8   driver in changing tires or making minor repairs and assist in

9   putting on or removing chains."

10        THE COURT:  And what does the statute say with

11   regard to being a driver's helper?  You just defined for me

12   what the acts of being a driver's helper are.  So what does

13   that mean under the statute?

14        MR. HACKER:  The statute says if you're a driver's

15   helper, you're exempt.

16        THE COURT:  That if you're a driver's helper, you're

17   exempt?

18        MR. HACKER:  There are four categories of exemption:

19   Driver, helper, loader, mechanic.

20        THE COURT:  Right.  And so you want me to include

21   driver's helper within helper and loaders?

22        MR. HACKER:  Yes.  Helper, yes.  That's with the

23   helper.

24        THE COURT:  Well, what is it that you want me to

25   add?  Because the law, as I understand -- tell me what you

1   want me to add first, then I'll address it.

2            MR. HACKER:  Just as I read that those types of --

3   that those type of safety-related things, the dismounting of

4   vehicle in these circumstances is -- if these are part of the

5   duties of these people, then they would be drivers' helpers.

6   It's not just loading the vehicles.

7            THE COURT:  Okay.  As I understood your claim, you

8   were arguing that these plaintiffs were loaders.  I never

9   understood you to be arguing that they were drivers' helpers,

10  so the only thing I addressed in the charge was with regard to

11  the loading issue.  I mean, that's what you -- that's what I

12  understood from summary judgment papers and everything else.

13           MR. HACKER:  But I think the evidence, Mr. Verderber

14  called them drivers' helpers.  They all identified themselves

15  as helpers.  Nobody identified themself as a loader.

16           THE COURT:  Okay.

17           MR. HACKER:  It's a category.  And to the extent

18  that there may have been some, you know, emphasis on loading,

19  I agree they did loading as well, but I think that to not have

20  the helper portion of that is wrong.

21           THE COURT:  Okay.  What's plaintiff's position on

22  this?

23           MR. LICHTEN:  Well, I think the instruction as

24  written includes any act that involves a degree of judgment

25  and discretion in planning and building a balanced load or in

1   placing, distributing or securing the pieces of freight in

2   such a manner that the safe operation of the vehicles will not

3   be jeopardized.

4          THE COURT:  Well, yes, but that does have to do --

5   it gives the general description and specifically it's dealing

6   with the loading issue.  What defendant is saying is that the

7   driver's helper is a different definition, and then that, too,

8   should be explained to the jury as a basis for exemption.

9          MR. LICHTEN:  Well, as long as -- if the defendants

10  are asking that that whole regulation be --

11         THE COURT:  Well, I'm not going to add the

12  regulation.  I'll do something similar to what I did with

13  regard to the loaders, in terms of explaining it to the jury.

14  At the end of the day, what the law does say, that any such

15  task has to be a substantial part of their employment

16  activities.

17         MR. LICHTEN:  Right.

18         THE COURT:  So that part stays as is.  Let me just

19  find where I have in the information.

20         MR. HACKER:  I do have another comment on that as

21  well, Your Honor.

22         THE COURT:  I'm sorry?

23         MR. HACKER:  I have another comment on that.

24         THE COURT:  Sure.  Let me hear your comment.

25         MR. HACKER:  The same regulation, if we go to part

1  B, reads that an employee may be a helper under the official

2  definition, even though such safety-affecting activities

3  constitute but a minor part of his job, and they give the

4  example of an armored car.

5           THE COURT:  I know what the statute says, but I'm

6  looking at Supreme Court case law and cases from other judges

7  in this court that have looked at the Supreme Court cases on

8  this issue as basically requiring conduct to be more than

9  simply de minimus.

10          MR. HACKER:  That is correct.  But maybe the

11  difference is there's a gap between de minimus, which is

12  trivial, casual, and a minor part of the job.  In other words,

13  if I'm an armored car guard in the back, I have -- my job

14  mainly is to protect the money or the gold or whatever it is.

15  So a minor part of my job may be if we have to turn the

16  vehicle around, I get out and I help.  That's different from

17  de minimus or casual, like --

18          THE COURT:  You really do think getting out -- I'm

19  sorry.  Go ahead, Counsel, I didn't mean to cut you off.

20          MR. HACKER:  There is something between de minimus,

21  which I agree with if it's casual, you know, if I get out of

22  the truck at lunchtime or something, it doesn't make me

23  safety-related just because I'm standing near the truck.  But

24  if I have a function that maybe only once every three weeks or

25  a month, you know -- but probably, frankly, with turning

1  trucks around it's probably much more than that -- that I have

2  to get out.  It's not my main function, it's mainly to load

3  and unload the trucks, but it is a minor part.

4        But what they tried to say is, I think, that if it's

5  a regular part of what you may be doing, even if it's a minor

6  part, that that should be considered.  With de minimus, it's

7  sort of a once in a blue moon something happens that, you

8  know, wasn't even planned or required.  That's de minimus.

9        So I know the case law, you are correct, obviously,

10  on that, but I think that this is the regulation.  I don't

11  think it's been held to the --

12        THE COURT:  Well, no, the cases interpret the

13  regulation.  That's the problem.  And so I have to go with the

14  case law, not with what the regulation says, ultimately.  I

15  mean if the Supreme Court is saying this is what it means,

16  then I have to rely on the Supreme Court's determination of

17  what that meaning is.

18        MR. HACKER:  Is that a question of fact?

19        THE COURT:  It's a question of fact for the jury to

20  determine what is de minimus, but the Supreme Court in their

21  decisions have come down and said it has to be substantial, it

22  has to be a substantial part of the ordinary duties, and it

23  also cannot be de minimus.

24        MR. HACKER:  I know there's a recent case -- I don't

25  have it in front of me -- with an armored car where, again,

1   all they did was going out -- they were armored car guards and

2   they cited the regulation as it is even though they don't

3   regularly --

4           THE COURT:  Who was citing that case?  Which court

5   decided that case?

6           MR. HACKER:  I don't have it in front of me, Your

7   Honor.

8           THE COURT:  Well, do you know what level court?  Was

9   it a District Court case or --

10          MR. HACKER:  I believe it was District Court.

11          THE COURT:  Yes.  I mean, I'm looking at the Supreme

12  Court cases on this issue as to what exactly needs to be shown

13  to put this charge together.  I'm happy to put in the

14  information with regard to the driver's helper, since what

15  you're saying is that that is a different prong of the

16  exemption that you're relying on.  So tell me what you want me

17  to add with regard to that.  I'm not going to add the

18  entire --

19          MR. HACKER:  Again, I think, obviously, focusing not

20  so much on crossing railroad tracks, but the idea that they

21  would be involved in stepping out of the vehicle and helping

22  to make sure on a busy highway if they're coming in or out of

23  driveways or if there were breakdowns, that the safety of the

24  vehicle -- that they are involved in protecting the safety of

25  the vehicle.

1          THE COURT:  Can I see that statute?

2          MR. HACKER:  Sure.  Regulation.

3          THE COURT:  Yes.  What does it mean when it says,

4    Counsel, that this term does not include employees who ride on

5    the vehicle and act as assistants or relief drivers?

6          MR. HACKER:  I think -- that I think they're

7    referring to they become drivers, not helpers.  They become --

8    they fill in for the drivers.  Again, if you look through

9    this, the section --

10         THE COURT:  No, no, no.  Counsel, the statute reads,

11   and I'm reading just looking at the plain language of the

12   statute:  "A driver's helper is an employee other than a

13   driver who is required to ride on a motor vehicle when it's

14   being operated in interstate or foreign commerce."

15         And then it specifically says:  "This term does not

16   include employees who ride on the vehicle and act as

17   assistants or relief drivers."

18         So you think that means regular drivers?

19         MR. HACKER:  For example, it wasn't in his

20   testimony, but Astro, if it's a slow time and they have a

21   driver going out and he needs one assistant, they may have the

22   assistant as another driver who might relieve him.  They might

23   have two drivers in the truck if it's a long haul.  One's

24   driving, then the other one is driving.  He's an assistant,

25   he's sitting up there.

1        But if you look at the prior section, I think -- in

2   other words, it starts off -- I don't have it in front of me

3   anymore, but you say other than the driver.  Someone who's

4   sitting there other than the driver is a helper.  So it

5   implies that if an assistant who is a driver, then that would

6   not be under the helper, he'd be under the driver category.

7        THE COURT:  A plain reading of this statute does not

8   say to me what you're telling me it says.

9        MR. HACKER:  You have to look at the section before.

10       THE COURT:  Okay.  So you're now asking me to do

11   statutory interpretation, to look at multiple parts of the

12   statute to figure out what this statute says on its face.

13       MR. HACKER:  What it says is that if you're not a

14   driver, if you're sitting there and you're not a driver,

15   right, then you're to be in the helper category.  Then it goes

16   on --

17       THE COURT:  Except that it's specifically defining a

18   driver's helper, which to me suggests someone who is there for

19   the purpose of helping the driver.

20       MR. HACKER:  Right, right.  And that's why it goes

21   on to explain what a driver's helper, what the category is

22   comprised of.  The way you read it, then the helper is just --

23   not an exempt category, which is wrong.  In other words, if

24   you're a helper --

25       THE COURT:  You need to give me a case interpreting

1   this.  Your interpretation of this does not square with the

2   language of it.  So unless you're giving me a case to tell me

3   what that says, I don't understand it to say that.

4            MR. HACKER:  Well, what your interpretation is, that

5   if it's not the driver's --

6            THE COURT:  Counsel, I'm not interpreting.  I'm

7   reading the statute.  I just read it.  You're asking me to

8   read something into it.

9            MR. HACKER:  No, I'm just asking for the language in

10  the regulation to be explained that that's part of the safety

11  operation.

12           THE COURT:  I'm not going to put in examples.  If

13  you want me to give a definition that's in the statute, that's

14  all I'll do, but I'm not going to put in examples of what the

15  conduct could be.

16           MR. HACKER:  You did that for loading.

17           THE COURT:  What do I have in here for loading,

18  Counsel?

19           MR. HACKER:  Safety-related.

20           THE COURT:  Right.

21           MR. HACKER:  These are safety-related as well.

22           THE COURT:  To be a driver's helper.

23           MR. HACKER:  Yes.  That's the whole gist of this

24  whole regulation.  All four -- all four categories are

25  safety-related categories.  These are very important

1  safety-related categories.  To just leave them out, say then

2  it's only loading, then what is a driver's helper?  That's an

3  exempt category.  There's nothing in your instructions that

4  would give them any guidance on that.

5          THE COURT:  Well, Counsel, this is why submitting

6  jury charges with case law or whatever it is you're relying on

7  becomes helpful for me as a judge.  This is not something you

8  cited to me before.  And you're now asking me to read it and

9  to give it a certain interpretation, based on what you're

10  telling me, so that I can charge a jury on that.

11          MR. HACKER:  I think, again, these are specific

12  examples of what a driver's helper does that were part of the

13  duties of these three individuals if the jury finds that.

14          THE COURT:  Counsel, I'll do the research.  I have

15  to make sure that what I'm charging to the jury is the law as

16  it should be.  Okay.  Go ahead.  I'm looking into that issue.

17          What are your other objections?

18          MR. HACKER:  They're very minor.  On page 13 on the

19  top, I think -- it's the second full paragraph.  I believe

20  there's a word left out.  And that's, it says:  "However, if

21  you find the plaintiffs had more than trivial

22  responsibilities," et cetera.

23          THE COURT:  I'm sorry, on page 13 where?

24          MR. HACKER:  Thirteen, five lines down.

25          THE COURT:  Okay.

1          MR. HACKER:  So you've said that the defendant is

2     not liable.  Then you say:  However, if plaintiffs had more

3     than trivial responsibilities and tasks that affected motor

4     vehicle -- then you may find the defendant is liable.  If they

5     had no more than trivial I think is what you were saying.

6          THE COURT:  Correct.

7          MR. HACKER:  And the only other comment, there's a

8     couple of places where you say safety operations.  I would

9     just ask that be safety-related operations.

10          THE COURT:  Well, I'm going, again, by the language

11    that's being used to describe this.  You want me to change it

12    to what?

13          MR. HACKER:  Just safety-related.

14          THE COURT:  Well, I understand this to be a specific

15    term of art that's being used by the Court in terms of stating

16    safety operations, which is why I cite it that way.  In fact,

17    I had it written another way and when I looked at the case law

18    and saw that specifically it's referred to as safety

19    operations I changed it back, or operation safety, whichever

20    one it is.

21          MR. HACKER:  I like operation safety better than

22    safety operation.  Sorry, Your Honor.

23          THE COURT:  And which specific page are you

24    referring to?

25          MR. HACKER:  On 13.

1          THE COURT:  Okay.  Anything else, Counsel?

2          MR. HACKER:  Just looking.  I think that's it, Your

3    Honor.

4          THE COURT:  I'm just going to look at the law on

5    that issue.  (Pause.)  I just re-read your charge and there's

6    nothing in there about any of this, Counsel.

7          MR. HACKER:  That may be.  The problem is the

8    testimony opened this area.

9          THE COURT:  Well, Counsel, you're supposed to

10   prepare for your case in advance and know what your testimony

11   is going to show so you can suggest what the charge should be.

12   So to be asking me here to add a charge that you never

13   proposed based on a regulation without any case law to support

14   what that regulation means --

15         MR. HACKER:  I think these are specific examples.  I

16   think the regulation is clear.  It even says in the regulation

17   something about that these helpers could also be loaders as

18   well, and then it refers you to the next section as to safety

19   of operation for loaders.  So this is equivalent to the

20   section on loaders.  It's not --

21         THE COURT:  I'm glad you think that, Counsel, but

22   not giving me the opportunity, one, by proposing it; two, by

23   submitting law; and handing me a copy of the regulation in

24   court telling me what that regulation means is not how we

25   conduct trials.

CHARGE CONFERENCE                    34

1        MR. HACKER:  I apologize, but, you know, it is what

2   it is right now.

3        THE COURT:  I appreciate that.  But appreciate also

4   that I'm not going to sit here and accept what you tell me a

5   regulation means when I don't even -- I'm not familiar with

6   it.  It's not something you suggested to me so that I even had

7   a chance to look at it.  So I'm sitting here trying to find

8   case law on this so that I can figure out what is the

9   appropriate law I need to charge the jury on.

10        Do you know when that regulation was issued,

11   Counsel?

12        MR. HACKER:  No, I do not.  These regulations are

13   repeated year after year.  It says, yes, it was 1971, amended

14   in 1972.  It says 1971.  It has 36 Federal Register 21788 --

15   778.  Then there was an amendment.

16        THE COURT:  Okay.  I'm going to look at that and add

17   something.  Are the parties ready to go?

18        MR. HACKER:  Ready.

19        MR. LICHTEN:  Can I have 15 minutes for lunch?

20        THE COURT:  For?

21        MR. LICHTEN:  Lunch.

22        THE COURT:  You guys haven't had lunch?

23        MR. LICHTEN:  No.

24        THE COURT:  Okay.  Have the parties looked at the

25   verdict sheet?

CHARGE CONFERENCE                    35

1         MR. LICHTEN:  Yes.

2         THE COURT:  Are there any comments to the verdict

3    sheet?

4         MR. LICHTEN:  No.

5         MR. HACKER:  Well, yes.

6         THE COURT:  Go ahead, Counsel.

7         MR. HACKER:  This would relate to what we were just

8    talking about.  Number 9 on page 3, has defendant proven that

9    plaintiffs worked with defendant as a helper or loader engaged

10   in safety operation?

11        THE COURT:  As a helper or loader?

12        MR. HACKER:  Just add "a helper or," yes.  You have

13   "loader."

14        THE COURT:  Yes.  Okay.  Anything else?

15        MR. HACKER:  No.

16        THE COURT:  Anything from you, Counsel?

17        MR. LICHTEN:  No.

18        THE COURT:  Okay, why don't you come back at 2:30.

19        (Lunch recess.)

20        (In open court outside the presence of the jury.)

21        THE COURT:  I just wanted to show the parties what I

22   had in terms of the helper language.  There's actually going

23   to be a fire drill at 3.

24        MR. HACKER:  Are we exempt?

25        THE COURT:  We can stay in the courtroom, but I

SHERRY BRYANT, RMR, CRR

PROCEEDINGS                          36

1    don't think we'll be able to hear anything over the alarm.

2          I've made all the other changes that the parties

3    suggested and this is just language that I added as to the

4    helper from the statute after looking at the statute and the

5    case law.  Is there any objection?

6          MR. LICHTEN:  No.

7          MR. HACKER:  It's fine.

8          THE COURT:  Okay.  So we'll be ready to go.

9          (Jury enters courtroom.)

10          THE COURT:  Ladies and gentlemen of the jury, I

11    apologize for the fact that you've been waiting all day to see

12    us and hear from us, but with the parties I had to work

13    through a number of legal issues, and sometimes it's just

14    unavoidable.  So I really do apologize, but we are going to

15    now have the summations.

16          You will hear from plaintiffs' attorney first, and

17    then the defendant will go, and then plaintiff gets a brief

18    rebuttal.  And then I'll charge you on the law and you can

19    deliberate.

20          At 3:00, there's going to be a fire alarm, so don't

21    get scared when it starts going off.  And depending on how

22    loud it is, we may have to stop what we're doing and just wait

23    for the sound to stop.  Okay, so please bear with us.

24    Counsel.

25          MR. LICHTEN:  Good afternoon, ladies and gentlemen

SUMMATION - LICHTEN                    37

1   of the jury, Your Honor, Mr. Hacker --

2          THE COURT:  You have to keep your voice up or you

3   can wear the mic and Ms. Francis will help you.

4          MR. LICHTEN:  I'll keep my voice up.

5          COURTROOM DEPUTY:  I'll put it down here.

6          MR. LICHTEN:  Plaintiffs believe that Mr. Godwin,

7   Mr. Griffin and Mr. Callace are all very credible and very

8   believable witnesses.  But in this case, you can decide the

9   questions that you have to decide just by looking at the

10  defendants' case, because the defendants' evidence falls into

11  one of three categories:  Either they admitted what we accused

12  them of; either they admitted at one time and denied at

13  another time what we allege; or that they denied it and the

14  denial is so weak that it, in effect, buttresses our claims.

15         Let's start with the allegation that they weren't

16  paid for all the hours that they worked.  The defendants put

17  into evidence Defendant's Exhibit A, which they claim is the

18  time slips that the checks were based on, the paychecks were

19  based on.  I defy anyone to look at this exhibit and to make

20  heads or tails of it and to figure out how much anyone was

21  paid and how many hours they worked during a particular week.

22         Let's examine this, though.  How was this generated?

23  Mr. Verderber testified that he in his office at 6 a.m. looked

24  to see who came in at what time and then he noted it on this

25  document, what time they came in.

SUMMATION - LICHTEN                    38

1          Now, Mr. Verderber is the chief executive officer

2    and the president of this company, which has up to at least

3    50, maybe 70 employees, has 20 and 30 helpers, drivers.  He

4    has like a dozen trucks that have to come in and go out.  He's

5    making all kinds of assignments, making all kinds of decisions

6    early in the morning.  And it's just impossible --

7               (Fire alarm.)

8               THE COURT:  Sorry, Counsel.

9               MR. LICHTEN:  Should I continue?

10              THE COURT:  Yes.

11              MR. LICHTEN:  If Mr. Verderber was standing by the

12   front of the building --

13              (Fire alarm.)

14              THE COURT:  I think that's the end of it.  Marshals,

15   is that the end of it?

16              THE MARSHAL:  That's the end of it, Your Honor.

17              THE COURT:  Okay, thank you.  You can proceed,

18   Counsel.

19              MR. LICHTEN:  As I was saying, Mr. Verderber wrote

20   down the times people came in, supposedly, when he saw them

21   first thing in the morning.  Given his responsibilities and

22   his job as the head of the whole company, there's no way that

23   he could do that with any accuracy.  If he sat by the front

24   door of the building --

25              (Fire alarm.)

1          THE COURT:  They're announcements only.  That's it.

2    Go ahead.

3          MR. LICHTEN:  If he sat in front of the building and

4    took down nothing other than when people came and what time

5    they came at and who came, it still would be tough for him to

6    make an accurate representation of when people's day started.

7    But doing it as he said he did it, by sitting in his office

8    and waiting until he saw people either walk in or walk by his

9    office --

10          THE COURT:  Slow down, Counsel.

11          MR. LICHTEN:  Doing it that way, there's no way that

12   this is an accurate portrayal of when people started their

13   day.  If he didn't see someone for an hour, then they don't

14   get paid for that hour?  If he didn't see someone at all, then

15   they don't get paid for that day?  That's not the way it's

16   supposed to work.  When they come to work, they're supposed to

17   get paid starting the first minute they come to work.

18          The time-outs, the testimony as to how the time-outs

19   were recorded is even more mystifying, because he wasn't there

20   after 5 or 6 o'clock in the evening.  He said he relied on

21   someone else to tell him when the employee left that day.  So

22   this has the added error that's built into the system of

23   relying on a third party or someone else to tell him when that

24   person left.

25          Most companies or some companies, at least, of this

1    size have a punch clock or they have a sign-in system or they

2    have an ID card that you can put in front of a ray or they

3    have a fingerprint system or thumbprint or something.  And

4    actually, this business has it, too.  The witness this morning

5    testified that they have a punch clock system for the people

6    in the back office.  And that's a much more accurate system

7    and it's much more easy to figure out how many hours someone

8    worked compared to this.  Why didn't they use the punch clock

9    system instead of this?  I don't know.  It would have made a

10   lot more sense.

11          If you look at this document, and I urge you to look

12   at it carefully and look at all the different pages, there's

13   things scratched out.  There's apparently things whited over.

14   There's things crossed out.  There's numbers written over

15   other numbers.  It's hard to read.  It's hard to figure out

16   whose hours are being talked about.

17          There's also the issue of lunch that was raised

18   during the testimony.  And lunch is apparently deducted under

19   the column that's entitled "deduction."  Sometimes it's minus

20   a half, sometimes it's minus one, sometimes it's minus one and

21   a half, minus two.  Sometimes there's nothing written there.

22          The lunch also has to be accurate.  If the person is

23   not paid for lunch, then Mr. Verderber would have -- or at

24   least someone would have had to have seen the person leaving

25   for lunch and when they come back from lunch.  In a punch

1   clock system, if you're not being paid for lunch you punch out

2   when you leave for lunch and you punch back in when you come

3   back.  That's not this system.

4        And Mr. Godwin explained very simply, very easily

5   why the lunch issue doesn't solve this problem.  Because even

6   if a half an hour was deducted for each day and you worked

7   five days in a week, that's only two and a half hours.  And

8   the discrepancies between the time, the period -- the hours

9   that people worked and the hours that they were paid for was

10  much more than two and a half.

11        And furthermore, Mr. Godwin testified that very

12  often he didn't even get lunch.  He ate -- he worked his way

13  through lunch, he ate lunch on the run, and so he didn't get

14  his half an hour.  And there's no way that Mr. Verderber would

15  know whether or not he got -- the people got the half an hour

16  that they were supposed to get if he wasn't there and he

17  didn't see them and they didn't punch in or punch out or any

18  reliable method of showing their time.

19        Now, even on its own terms, even if you accept this

20  document as accurate, the hours don't add up.  I urge you to

21  look at -- you can pick a week at random or you can pick a

22  week that I picked right at the beginning of Mr. Callace's

23  job, the period he worked for Astro, the week of August 4th,

24  2009.  If you look at Plaintiff's Exhibit 10, which are the

25  information that was on the pay stubs, he was paid for 51 and

1   a half hours that week.  Actually, he was paid for 36 and a

2   half hours for August 4th, 2009.

3           Let's look at August 4th, 2009.  He was paid for 36

4   and a half hours that week.  But if you look at Defendant's

5   Exhibit A for the days that went into that check, July 25th,

6   27th, 28th, 29th, 30th and 31st, he worked 53 and a quarter

7   hours.  So that's 17 hours that he wasn't paid for even if you

8   accept their documents.

9           The next paycheck, August 18th of 2009, two weeks

10  later, he was paid for 51 and a half hours.  And if you check

11  their document, Defendant's Exhibit A, and you look at the

12  days of the week that went into determining that paycheck, he

13  actually worked for 56 and a half hours.  So he wasn't paid

14  for five hours.

15          So even by their own standards, by their own

16  documents, by their own evidence, as I said at the beginning,

17  they weren't paid the number of hours that they were supposed

18  to be paid.

19          Their response to all this is, well, if you weren't

20  paid the hours that you worked, you can complain, you can go

21  to Mr. Verderber.  And they have a whole system set up where

22  you can go to Mr. Verderber.  You can't go to him between the

23  hours of 6 and 8, because then he says he's a little bit

24  rough, but if you go to him the other hours and you complain

25  about it, then they'll look at your complaint and they'll

SUMMATION - LICHTEN                    43

1   decide.  And there's actually a person who came in today, the

2   witness said her job is to issue the checks to people who come

3   in and successfully argue that they weren't paid the right

4   amount.

5           But, again, it's not up to the workers to figure out

6   how much they worked, how many hours they worked.  They're not

7   supposed to keep the records.  These are people who are

8   getting paid for providing physical labor.  They're paid for

9   using their backs and their arms and their legs.  They're not

10  supposed to have a degree in accounting or bookkeeping.

11  They're not supposed to keep track of all their hours.  It's

12  the employer's job to keep track of the hours.  And this

13  employer didn't do that, didn't do that with any type of

14  accuracy, didn't do that with any type of effort to make sure

15  that the hours were correct.

16          I believe and the plaintiffs calculate that in the

17  case of Mr. Griffin, he actually worked for Astro for 134

18  weeks total time that he worked there.  And if you take it

19  about six hours a week, on average, like he said he thought he

20  was out, that's about -- that's 800 hours if you multiply that

21  by the number of weeks, and it's approximately $10,000 at his

22  rate of pay.  That's how much he believes he's out for the

23  period of time due to the fact that he wasn't paid for all the

24  hours that he worked.

25          For Mr. Godwin, he worked for Astro for 38 weeks.

SUMMATION - LICHTEN                    44

1   That was his total time that he worked there, 38 weeks.  If

2   you take it seven hours a week, that equals 266 hours, and at

3   his rate of pay, which was $12 an hour, that's about $3,000

4   that he thinks he was out because he wasn't paid for all the

5   hours he worked.

6          And for Mr. Callace, who worked there for 69 weeks

7   during this period of time, at five hours a week, on average,

8   he was not paid for the time that he worked, that totals to

9   about 345 hours, and that's $5,000 that he thinks that he was

10  out because he wasn't paid what he worked.

11         And it would be hard for a worker in any

12  circumstance, but particularly in this circumstance, to make

13  the complaints that the defendant says they should have made

14  and that they would have been reimbursed if they had.

15         Mr. Callace testified that when he got there, right

16  in the first few weeks, the checks that I was talking about

17  right around that time period, he went to Mr. Verderber and

18  Mr. Verderber said, well, come back next week.  And he came

19  back the next week and he still wasn't paid.

20         Mr. Godwin said, you know, he just started on the

21  job, he was relatively new, he didn't want to lose the job, he

22  didn't want to get yelled at, he didn't want to get fired, so

23  he didn't complain.

24         Mr. Griffin said he complained and got nowhere.

25         But a system shouldn't rely on complaints.  It

1  should be accurate.  It should give people the time that they

2  work, the pay for the time that they work, and they shouldn't

3  have to come every week and complain and make a formal

4  complaint and challenge the boss in order to get paid.  That's

5  not the way this is supposed to work.

6             There's also a question that you'll be asked, was

7  this willful?  I believe that if anyone doesn't pay someone

8  for the time they worked that that's willful in and of itself.

9  It's not a mistake.  If they don't keep accurate records and

10  they know their records aren't accurate and they have a whole

11  system set up.  They asked, well, how often do people come in

12  and challenge their time?  And the witness today said, well,

13  once a month maybe.  Mr. Verderber said he couldn't calculate

14  it.

15             This is not the way that you get paid in America.

16  They're supposed to pay people what they work for and anything

17  else is a willful violation of the law, the law of the state

18  of New York, and also the law, the federal law, because you're

19  entitled to be paid a minimum wage under federal law, and if

20  you're paid nothing that's obviously less than the minimum

21  wage.  So you're entitled to be compensated for all the hours

22  that you worked that you weren't paid for.  And it's up to you

23  to figure out what that amount is, based on the testimony,

24  based on the evidence, based on the documents.

25             The next area of the case that I want to talk about

1   is the overtime.  Now, Mr. Verderber said that in the industry

2   we're exempt, we don't have to pay overtime.  I tell you that

3   the statement of the law that you have to go by is the law as

4   the judge tells it to you.  That is the law that governs, not

5   what Mr. Verderber says.  I would submit to you that even if

6   it wasn't a violation of your oath to not follow the law as

7   the judge says, I think it makes a lot more sense that the

8   judge knows what the law is more than Mr. Verderber.

9           It's not the case that the law is that the whole

10  moving industry is exempt.  I don't even think Mr. Verderber

11  believes that.  The rule is that if these people did a job

12  that involved judgment and discretion involving safety, such

13  as deciding where to put items on the truck so that the truck

14  doesn't tip over, that that makes them exempt because they're

15  covered by another law and not covered by the overtime law.

16          And in that case, Mr. Verderber said that these

17  workers do decide safety issues, that they do load the trucks

18  and that they decide where on the trucks the boxes go.

19          At an earlier time, at his deposition, before he

20  probably realized that the truth is not in his interest, he

21  said the exact opposite.  He said that the drivers load the

22  trucks, the drivers decide where the boxes go, and the helpers

23  are merely workers who are supervised by the drivers and who

24  the drivers tell exactly what to do.

25          And that's the case.  That's what the actual reality

1    is.  And it makes sense, because, otherwise, why would drivers

2    be paid more than helpers?  Why would drivers be higher up in

3    the hierarchy?  Why would helpers be supervised by drivers?

4    Drivers are the ones who decide the safety issues.  They're

5    not -- they're exempt, they're obviously exempt.  The helpers

6    are not exempt.  The helpers have to be paid overtime if they

7    work more than 40 hours.

8            Now, Mr. Verderber testified that sometimes he gives

9    overtime when they work less than 40 hours.  And it's his

10   theory or his philosophy that if he gets paid more for a

11   certain job, the workers should get paid more for a certain

12   job.  That may be magnanimous of him, but it's not the law,

13   because if they work more than 40 hours in a week, no matter

14   what they get paid for less than 40 hours a week, when they

15   work more than 40 hours in a week they have to get paid time

16   and a half.

17           And you can look at Plaintiff's Exhibits 8, 9 and

18   10, which are the time records for each of the plaintiffs, and

19   you can see for yourself that there are weeks in which they

20   worked more than 40 hours, where they worked 45 hours, where

21   they worked 50 hours, where they worked 55 hours, and they

22   were paid the regular straight time hourly rate for the entire

23   period of time.  They weren't paid time and a half.

24           And you can calculate almost precisely if you do

25   the -- if you take the time and do the math how much each

1   person is owed for overtime, because if you look at the weeks

2   that they worked more than 40 hours and you take the excess

3   over 40 and you multiply that by half of their hourly rate,

4   you get exactly what they're owed.

5            And for Mr. Griffin that amount is 109 hours, at his

6   rate of pay that equals $705.75; Mr. Godwin, who worked 64

7   hours of overtime without getting paid time and a half, that

8   equals $382.50; and Mr. Callace, who worked 483 hours of

9   overtime without getting time and a half, that equals

10  $3,622.50.

11           And, again, you're going to be asked whether this is

12  willful.  These days, I think it's almost every employer

13  should know that his workers get time and a half.  Mr.

14  Verderber's statement of what he thought the law is is so off

15  base that I don't think you can even believe that he thinks

16  that's what the law is.  It's not what the law is.  The law is

17  as the judge tells you what it is.  And I think that Mr.

18  Verderber willfully ignored the law when he refused to pay

19  people overtime the time they worked over 40 hours.

20           These people are helpers.  They move boxes from

21  place to place.  They don't decide where it goes on the truck.

22  If they put the boxes on the truck as they testified to, then

23  the supervisor is the driver.  And the driver tells them

24  exactly where to put it, exactly where in the truck it goes,

25  and he decides the safety issues, because in the end he's

1    going to be the one responsible for it.

2            Now, the next issue is the discrimination claim, and

3    in this claim you're going to have to use your own

4    determinations as to what the credibility of the witnesses

5    were, who is telling the truth and who isn't telling the

6    truth.  Our contention is that Mr. Griffin and his ex-fiancee,

7    Ms. Barnett, were telling the truth, and that Mr. Verderber,

8    when he denied making those statements, was not telling the

9    truth.

10           It's not hard to believe that Mr. Verderber, who

11   referred to Ms. Barnett as a girl, uses demeaning language

12   when he refers to certain groups of people.  He admitted that

13   he made assignments for a multi-day job for moving and on the

14   last day he changed the assignment.  He denied it was for

15   racial reasons, but Mr. Griffin testified that he thought it

16   was and he based it on Mr. Verderber frequently using racial

17   slurs.  I don't think Mr. Griffin would make that up, but it's

18   up to you to decide who's telling the truth.

19           Mr. Griffin estimated that the amount of tips that

20   he didn't get because of these discriminatory policies totaled

21   about a thousand dollars.  Mr. Godwin, who worked there maybe

22   a quarter of the time that Mr. Griffin did, that would equal

23   maybe $250.  That's what they figure they were out because of

24   the discriminatory assignments.

25           You're going to be asked if you believe that the

1  plaintiffs are entitled to punitive damages.  You have to find

2  that there was malice or a reckless disregard for the

3  plaintiffs' rights.  We would contend that any time that you

4  use the language that Mr. Verderber used and that you

5  discriminate on the basis of race that that would be

6  malicious, that would be a reckless disregard of plaintiffs'

7  rights.  There's no way that that could be an accident.

8  There's no way that that could be inadvertent.

9        We believe that, in your estimation, however much

10 you believe is the right amount, they should be entitled to

11 punitive damages.

12       And finally, maybe not -- last but not least, we

13 have the criminal conviction discrimination claim, which is

14 the heart of the matter.

15       As a threshold issue, Mr. Verderber said that he

16 never fired Mr. Griffin, that he was not discharged, that he

17 voluntarily quit.  But Mr. Verderber admitted that he told Mr.

18 Griffin that he had no work for him, because of the

19 circumstances that he couldn't give him any work on any of his

20 moving jobs, that he only pays people for the work that they

21 do, so he couldn't pay him.  And then he didn't deny that he

22 told Mr. Griffin to leave the premises, or Mr. Griffin said,

23 in a more colorful way, get the fuck out of here.

24       Now, if there's no work for Mr. Griffin and there's

25 no pay for Mr. Griffin and he's supposed to leave the

1  premises, that seems to me all the elements of discharge have

2  been established.  It seems to be a firing to me.

3         And even Mr. Verderber admitted that several weeks

4  later he told the Department of Labor that Mr. Griffin was, in

5  fact, fired, was, in fact, fired because he failed a

6  background test, and that there would be no difference between

7  him saying that Mr. Griffin quit and Mr. Griffin was fired.

8         And I agree, there is no difference.  Mr. Griffin

9  was fired.  And even if you don't find that he was fired at

10  that point, Mr. Griffin, according to Mr. Verderber, would

11  have been fired anyway if he had had the guts to come back to

12  the facility and show up again for work.  He would have been

13  fired in any event.

14         So Mr. Griffin was fired.  Mr. Verderber even, when

15  I asked him about Mr. Godwin's firing, answered about Mr.

16  Griffin's firing by accident, and so even he acknowledged that

17  Mr. Griffin was fired.  We contend that there's no difference

18  between whatever happened to Mr. Griffin and being fired.

19  It's a discharge no matter how you look at it.

20         Mr. Verderber talked about other companies, what

21  they wanted, what they told him they wanted.  The judge will

22  instruct you that that's irrelevant.  I mean, if it's against

23  the law, it's against the law, whether your other companies

24  who are your -- that you're their agent or you work with them

25  or you have a contract with them or whatever the relationship

1   is, if that other company wants you to break the law, you

2   can't just go ahead and do what they want.  You can't break

3   the law and say, they told me to do it.  You have to be

4   responsible for what you did.

5           Now, let's see if they really did break the law.

6   The law in New York, as the judge will tell you, is that in

7   general, you can't fire someone with a criminal record unless

8   it's directly related to or there's a direct relationship

9   between the crime itself and the job that you're being fired

10  from.  Now, what is this job that they're being fired from?

11  They're helpers, they're drivers' helpers.  They move boxes.

12  They do physical labor.  They move boxes from here to there.

13  They do go into people's homes, but they only go into people's

14  homes for a short period of time, to pack things up, to put

15  them on the truck and to take them out.

16          There's no significant contact with children.  If

17  you're familiar with the nature of child abuse, the fact --

18  the chances of someone being abused as a child in the few

19  minutes that the workers are in the home taking out furniture,

20  taking out boxes, heavy items, is not reasonably likely to

21  occur.  If they can't do this job, then they can't do any job.

22  I mean, these are the jobs that people with criminal records

23  should be able to do and not have to be fired and not have to

24  explain about their past.

25          The past was a long time ago.  They did their time.

1   Mr. Griffin spent ten years in jail.  Mr. Godwin spent seven

2   years.  That's significant time.  It's hard time.  And once

3   they do, once they've paid their debt to society, that should

4   be the end of it.  Then they should be able to get jobs unless

5   there's a direct relationship.  There is no direct

6   relationship here.

7          If they were convicted of embezzlement and they

8   wanted to be a treasurer of a company, that would be a direct

9   relationship.  If they were charged with fixing horse races

10  and they wanted to be in the horse racing business or if they

11  were charged with securities fraud and they wanted to be a

12  stockbroker, those would be direct relationships.  Those would

13  be jobs that they could be kept from if they wanted to be

14  employed.  But not this job, not this crime.  This crime has

15  nothing to do with moving, it has nothing to do with physical

16  labor, and it has nothing to do with carrying heavy boxes.

17         What the law says -- and the judge will tell you

18  this -- is that each individual person, when the employer is

19  deciding whether or not to fire them, they must take into

20  account a certain number of factors, to balance them out and

21  to take that into account in deciding whether there's a direct

22  relationship.

23         I asked Mr. Verderber if he did that.  I asked him

24  if the first factor if he took into account the New York State

25  policy governing hiring people with criminal convictions.  And

1  he looked at me like I was speaking another language.  That's

2  the first thing you have to take into account when you're

3  deciding whether or not there's a direct relationship between

4  the crime and the job.  He didn't do that.

5           He didn't ask Mr. Godwin or Mr. Griffin about their

6  efforts at rehabilitation or their efforts to establish a new

7  life or what their circumstances were, their personal

8  circumstances.  He didn't ask about rehab, and that's one of

9  the -- you have to make an individualized -- personal

10  individualized assessment of each person.  You can't just have

11  a rule that says, well, if someone's convicted of a felony or

12  someone's convicted of a sex crime, then they're out.  That's

13  not the law.

14           You have to take into account each individual

15  person's circumstances, and Mr. Verderber admitted he didn't

16  do that.  He got the background report, based -- for Mr.

17  Godwin.  He said, that's it, he hasn't worked here that long,

18  I'm firing him, I'm not taking anything else into account.

19           As for damages on that claim, both Mr. Griffin and

20  Mr. Godwin made about $18,000 a year.  Mr. Godwin hadn't

21  worked there a year, but he was working, if you extrapolate it

22  out over a year, he made $18,000.  They both got unemployment

23  insurance benefits, which cover about half your income for two

24  years.  Mr. Griffin testified that he earned about 10 or 12

25  thousand dollars in the period of time since he was fired.

1            And you can also bring these damages forward.  If

2     you find that they would have worked at Astro for time in the

3     future, then you can give them damages for the future lost

4     pay.  That's called lost front pay.  I'll let you decide how

5     much you think that the compensatory damages are worth.  The

6     back pay is only a part of it.  Part of is also mental and

7     emotional distress.  Mr. Godwin and Mr. Griffin both

8     testified, I think very movingly, about how this whole episode

9     left them, how it affected them, how it hurt them.

10            Again, if we want criminal convicts to work in the

11    workforce at all after they get out of prison -- and the New

12    York State Legislature has said that we do -- then a job where

13    they're carrying boxes in and out of offices and carrying

14    boxes in and out of trucks should be a job that we can have

15    them do.  Once they do their punishment, once they do their

16    time, once they pay their debt to society, that should be the

17    end of it and they shouldn't be punished any more.

18            I ask you to find for the plaintiffs in this case.

19    I thank you for your attention, thank you for waiting around

20    all this time, thank you for listening to me.

21            THE COURT:  Thank you, Counsel.

22            MR. HACKER:  May it please the Court, Mr. Lichten,

23    ladies and gentlemen of the jury, I just want to thank you

24    again for your attention.  It's been long days, and we all

25    appreciate that.  You listened to all the witnesses and now

1    we're coming to the -- can you hear me, Your Honor?

2              THE COURT:  Very faint.

3              MR. HACKER:  I'll speak a little louder.  It's just

4    that my throat is a little sore.

5              Now we come to the point where you have some

6    decisions to make.  In a few minutes, I believe the Judge will

7    tell you the law and, as she's already explained to you, it's

8    your job to decide the facts.

9              Obviously, we don't see this case at all the way Mr.

10   Lichten sees this case.  First off, he starts off by telling

11   us that you don't have to believe my clients, he says, just

12   look at the other side, right, look at what they've done.

13             Well, I ask you to do the same.  That big book, you

14   will have it available.  Do look at it.  If you have any

15   questions, there's a lot of stuff in there.

16             And is the suggestion being made that Mr. Verderber

17   was keeping these records on a daily basis in order to cheat

18   the workers out of their time?  What business are these people

19   in?  Mr. Lichten just said, why don't they have a punch card

20   where they can punch in and out for lunch?  Hello, they're

21   moving.  They're out in New Jersey, in Queens, in Brooklyn.

22   How are they punching in and out?  They're coming in at 11:00

23   at night, 1 in the morning.  Punching in and out?

24             The man in charge, the driver or one of the senior

25   helpers reports the time, reports his time or her time,

1   reports the other people's time.  So unless he's cheating

2   himself and saying, well, we got in at 8:00, but they really

3   got in at 10:00, it doesn't make any sense.  And if you look

4   at the book, you'll see that it's grouped by truck.  So that

5   each group in each truck is checking in when they check in,

6   but usually checking out at the same time unless somebody had

7   to leave early.

8            So all of this is documented.  I think one of the

9   first things you should ask is what is each of these

10  plaintiff's evidence that he wasn't paid for hours he worked.

11  Each one of them simply said, hey, I wasn't paid about five

12  hours a week every week, maybe six hours, maybe seven hours.

13           When I asked specifically, I asked Mr. Callace and I

14  showed him the first week, then he said, well, maybe it was

15  the second week or the third week, I'm not sure.  It was

16  something like that.

17           Mr. Godwin didn't know any of this.  He said he had

18  some notes.  We haven't seen those notes.  If he was afraid to

19  talk to Mr. Verderber, whatever he was worried about, losing

20  his job, that may or may not be, but he didn't talk to Mr.

21  Verderber.

22           And we have testimony from Laura Smith, who's worked

23  there 22 years, that it's rare but when people come in and

24  they ask for an adjustment, they get an adjustment.  And

25  there's even on Mr. Griffin's paychecks in the very early --

1   you'll see payroll adjustments where he got extra money paid

2   to him because there must have been something missing before

3   everything became regular.

4           Remember, some of these men didn't work every day.

5   Sometimes something gets missed.  So there's no doubt that

6   there could be a mistake sometimes, but it's now being

7   suggested this is a pattern.  It's not an accidental mistake

8   if every week you're getting five or six hours less than you

9   should have gotten.  And I ask you, do you believe that these

10  men came there, got these jobs, were given these jobs, and

11  then were cheated regularly on their hours?  Why?

12          Mr. Callace came there, he said, I want $15 an hour.

13  I haven't worked here in years, but I know what I'm doing, I

14  want $15 an hour, which in the moving business is pretty good.

15  And did he get $15 an hour?  Yes.

16          Then we have Mr. Griffin comes in.  Somebody else

17  who works there recommends, hey, Tra, come on over, you can

18  get a job at Astro.  He'll hire you.  He does that.  Does he

19  get a job?  Yes.  He has no experience.  He's got a criminal

20  record, which, again, there's some dispute now.  Mr. Griffin

21  for most of the trial was saying, including to his own

22  attorney, he told him about his criminal record, never about

23  the specific criminal record; but then at one point when I

24  asked him, it was convenient to say, oh, no, I told him about

25  it, it was sexual abuse.

1              And yet, knowing that, this racist, Mr. Verderber,

2    invited him to his house with his children there, his wife.

3    Mr. Godwin testified he and Mr. Griffin were at the house on a

4    number of occasions alone with Mrs. Verderber.  Is that the

5    behavior of a racist?  Is that the behavior even of somebody

6    who knows that these two men are rapists, sexual offenders, at

7    home alone with your wife?

8              Maybe it is.  If it is, it's because even Mr.

9    Griffin said, he trusted me.  He was one of his most trusted

10   people, Tra Griffin.  He worked well and after about -- he was

11   there two and a half years and he received a raise about 18

12   months in.  That's not bad.  He was making $14 an hour, a

13   dollar less than Mr. Callace, the very experienced man who was

14   an assistant warehouse manager making $15 an hour.  So now

15   he's making $14 an hour.

16             Is that discriminatory?  Think about this.  Why are

17   you here?  You're a jury.  You're here to use your judgment.

18   I'm only asking you to use your judgment.  Is that the thing,

19   that somebody would hire you, give you a raise, trust you and

20   then cheat you?  And then when you ask him, as he says he did,

21   to correct the mistake, he tells you to get out of here with a

22   few expletives.

23             Are those consistent is what I'm asking you?  If I

24   did one, would I also be doing the other?  That's what you as

25   jurors have to decide, because there's nobody else to tell us.

1   We have no evidence whatsoever that any of these three men

2   were not paid for hours they worked.  There's no evidence.

3   They say -- and the average.  They say it's their word.  Now,

4   so Mr. Lichten apologizes -- I have to take a sip of water

5   every so often, I'm sorry.

6           Mr. Lichten says, look at the book, that book,

7   there's no way that Mr. Verderber could have kept track of all

8   those things.  Well, he's the big shot, he's the CEO.  The

9   truth is that was his job.  That was how he knew that this guy

10  is here and he has to go on that truck.  Oh, this guy didn't

11  show up today, what do I do?  I need somebody else.  I have to

12  call someone or I have to get somebody who's here and assign

13  them.

14          This is what he did.  This is why from 6:00 to 8:00,

15  don't come near him.  Don't ask him questions at 6 in the

16  morning when he's trying to get all the trucks out.  If you

17  have an issue, wait.  Talk to him in the afternoon.  I don't

18  think that makes him a racist.  I don't think it makes him a

19  cheater.  But, again, this is for you to decide.

20          So, again, what was the procedure?  You'd come in,

21  you'd walk by, he'd acknowledge your presence, he would make a

22  notation.  Listen, he's not a time clock, that's true.  And

23  when he put down 6:00, could it have been 6:02 or 6:03?

24  Probably.  Could it have been 5:58?  Probably.  If some of you

25  do punch time clocks and if you get -- I'm sure very few of

SUMMATION - HACKER                        61

1    you get in exactly at the time you're supposed to be in, but

2    if you're supposed to be in at 9:00 and you get in at 8:57, is

3    that overtime?  And I hope your employer if you get in at 9:02

4    doesn't say, well, I'm docking you two minutes.

5           So a time clock is there, but Mr. Verderber was

6    trying to keep track in general.  And if you look in the book,

7    you'll see some people in at 6:30, some at 7.  Now, it's true

8    he doesn't say 6:36.  I don't think -- I could be wrong, I

9    don't think he has that.

10          So yes, there's a record.  And for Mr. Lichten to

11   say there's no record of anything, you can say that the

12   records are inadequate and, therefore, you can believe these

13   three men, no matter what they say they lost in time they lost

14   it.  We're entitled to the money because we say so.

15          Now, I guess the other point is if this was so

16   widespread, then I don't know why there aren't 40 employees

17   here.  I don't know why Mr. Verderber has any employees,

18   because, frankly, I ask you folks, would you work -- it's one

19   thing if there's a little mistake.  Would you work for a

20   company if every week they cheated you five or six hours,

21   every week?  And if you went there once or twice or three

22   times, you were cursed and thrown out of the office, like get

23   out.

24          Would you work there and would you recommend your

25   friend to come there, because, remember, Mr. Griffin was there

1   for a year and a half or so when he invited Mr. Godwin to join

2   him.  He said, hey, come on over, it's a good place to work.

3   That's an odd thing to say, isn't it, if you've been cheated

4   every week, or at least say to the guy, hey, listen, watch out

5   for this guy, he's going to cheat you.  I didn't hear any

6   evidence of that.

7           Frankly, if you listen to Mr. Godwin, you know, he

8   was fairly -- I would say of the three, much more credible.

9   He said, I don't really know.  You know, it seemed like I was

10  missing something.  When I said, could it be because you

11  didn't -- the lunch and all that, he said, well, maybe that

12  was it.  And it could be that he didn't think about it the

13  same way that the employer does, because when the employer

14  sends you out, he says, you are entitled to lunch, I want you

15  to take lunch.

16          Now, if for whatever reason, because you guys want

17  to come back and you don't take lunch, he has no control over

18  that; but he doesn't know that and he can't pay you for that.

19  You're supposed to take lunch.  The law requires you to have

20  lunch and he deducts for that.  That's not what they're

21  talking about, is it?  I don't think that's what they're

22  talking about.

23          The other thing I think is interesting -- again, you

24  may disagree with me -- if you look at the hours -- now, they

25  have two different claims.  One is for overtime, because

1   they've had so many hours more than 40, and the other one

2   they're saying, well, we didn't get all our hours.  So now we

3   have an employer -- and, again, I've worked many years myself.

4   I question.  Use your experience.  If I were an employer

5   looking to cheat my workers out of time, would I put down 58

6   hours instead of 62 hours?  Oh, I'm not going to give him

7   those four hours, I'm going to give him 58 hours.  Or would he

8   have probably said 40 hours?  Then I don't have any issues

9   with overtime.  I'll just show 40 hours, whatever you worked.

10          If you show 58 hours and 57 hours and 61 hours, that

11   tells me something.  It tells me that he's putting down all

12   the hours that he knows of.  He's not looking to cheat you.

13          And, again, Mr. Callace, you look at his hours.  He

14   goes on these jobs.  He's out 11 and a half hours.  They

15   deduct for some time for a meal, but he gets paid.  He gets on

16   some of those jobs overtime, time and a half, 22.50 an hour.

17   Now we're getting up there.  Not so bad for someone with a

18   high school education.  And that's his job.  There's no

19   particular skill, he tells us.

20          Now, that's -- I'll get to that in a minute, but I

21   just want to make clear that if there are errors, they are

22   minor errors.  If there are minor errors, as Ms. Smith has

23   said, there's a procedure.  You go talk to Mr. Verderber, he

24   checks it, he looks in that book.

25          Now, I think it's not fair that Mr. Lichten said you

1    look in the book and you won't be able to make sense of

2    everything.  And you know what, he's probably right.  Because

3    when I looked at the book, I couldn't make sense of

4    everything, because I didn't know what a Rule 19 is and I

5    didn't know what a SID is and I didn't know a lot of the

6    terminology.  But that's not the standard, is it?  Mr.

7    Verderber knows what those things mean.  Ms. Smith knows what

8    they mean.  She told you sometimes she has to look at certain

9    things.  She knows what she's looking for.  That book is a

10   record for people in that company.  It's not just for -- it

11   wasn't done for this lawsuit.

12           Are there some erasures or corrections?  Well, what

13   does that say?  He's a cheater or maybe sometimes you make a

14   mistake.  You ever write something down and you have to erase

15   it, because your mind just wandered and you wrote the wrong

16   thing and you say, oh, gee, and you erase it.  Is that a sign

17   that you were lying or telling the truth?  So that's another

18   point.  All right.

19           Let's talk about overtime, because that is a little

20   complicated and the judge will explain it in detail, but this

21   is a little different because we're a motor carrier.  This is

22   a moving company and they are under certain different

23   regulations.  And Mr. Verderber told you that in his industry,

24   there is a standard where if you're an interstate -- we're not

25   talking about a local delivery truck.

1          But if you're an interstate mover, as this company

2    admittedly and undisputedly is, then your workers do not get

3    overtime just because it's 40 hours.  It's just not -- it's

4    not done.  It's not legally required.  It's an exemption.

5    Just like if any of you have a job where you are technically

6    an administrative person and you might work 50 hours a week

7    and the boss says thank you, doesn't pay you extra time,

8    because of the nature of your job.  I'm a lawyer.  I can work

9    a hundred hours a week.  I'm not going to get anything extra,

10   because that's the nature of my job.  That's fair.

11         And these workers understand that.  But they do get

12   a pretty decent wage, right?  They're not coming in at 7 and a

13   quarter an hour.  They're coming in at 12.  Now, Mr. Godwin

14   had been working in heavy construction, $9 an hour.  Now he

15   comes to this job, which I understand is a hardworking job,

16   but he's already up to $12 an hour.  So he's already getting a

17   three-dollar-an-hour raise at this job.

18         But overtime is a little different.  In other words,

19   Mr. Verderber is not stupid.  If he was trying to do something

20   improper, he's going to list 50 and 60 hours on the record

21   official time and not mark overtime.  Only if he understands

22   in his experience, based on the law as he understand it, that

23   he's not supposed to give you overtime.  If he thought he had

24   to give you overtime, for example, if you were an

25   administrative person like Ms. Smith on a time clock, overtime

1    there, you're not exempt under this act.  But only -- motor

2    carrier, only certain criteria, certain categories, which the

3    judge will explain in more detail.

4             So we tried in the testimony to highlight some of

5    these things.  You may not have understood at the time why are

6    we asking about certain questions, what they do with the

7    truck, do they go on the truck, do they load the truck, do

8    they step outside the truck and help it turn around.  You

9    might have said, who cares, what's that have to do with it?

10            Those are criteria the judge will explain to you

11   that have to do with the Motor Carrier Act and that certain

12   things -- for example, one category that's not at case here --

13   I think Mr. Lichten already mentioned -- is a driver.  A

14   driver is a clear category.  If you're a driver interstate,

15   you don't get overtime.  That's it.  So if you get $20 an hour

16   you get $20 an hour, but you don't get overtime.  Sixty hours

17   a week, it doesn't matter.  Now, you can't work more than a

18   certain number of hours for other reasons, because there are

19   regulations, but....

20            So, again, you listen to the judge.  That's all I

21   can ask, because this is a simple one.

22            As far as computation, if you find that we are

23   liable for overtime, it's just a matter of counting up hours,

24   as Mr. Lichten said.  I suggest to you that the company is not

25   responsible for overtime.  And there's that additional factor

1    that he mentioned to you, which was whether or not this was

2    intentional.  And that's because if it's intentional, there

3    are extra damages, okay.  And was this something that was

4    intentional?  He says, disregard that Mr. Verderber says it's

5    done in the industry.  But if it's done in the industry and

6    he's been doing it and his father's been doing it and

7    everyone's been doing it for all these years, if there were a

8    mistake, it would certainly not be intentional.  But, again,

9    we think there is no mistake.  We think he acted properly.

10        And each one of these has to be evaluated

11   separately, because each one's claim is separate.  I'm lumping

12   them together, but they're really not together.  Each man is

13   separate in his claim for hours, his claim for overtime, all

14   right.

15        And the judge will explain to you there are

16   different categories.  The general theme they have in common

17   is that they're safety-related, and we believe that it was

18   explained to you that when you load a truck, if you don't load

19   it properly it can cause problems for the truck, for the

20   driver, an accident, a tip-over, this kind of a thing.

21        Now, the difference in the testimony, you have to

22   decide who to believe.  First of all, I like the idea, I think

23   it was Mr. Griffin that said, when we go to the house, we have

24   nothing to do with the children or the -- they all leave.  Did

25   he say that?  He said, they all leave.  And then the question

1  is, if they all leave, who's giving instructions in the house?

2  They just leave the house.  How do you know what they want

3  packed?  How do you know what they'll pack themselves?  They

4  don't leave the house.  If any of you have moved, you don't

5  just walk out of the house when the movers come and say, we'll

6  see you in a few hours.

7          And he also says, well, we're only there a few

8  minutes, Mr. Lichten, only a few minutes.  What's going to

9  happen to a child?  Nothing.  Maybe.  But maybe your child is

10  playing in a bedroom and you want to tell the mover about the

11  toys, what to pack.  What if something happens?  Could it be?

12          I'm sort of bouncing a couple -- I'm crossing over

13  different parts of this, but in the overtime period we have

14  the safety issue.  When they load, there are people in the

15  house.  There are people in the house.  Children are in the

16  house.  And when you load, you have to load carefully.

17          And is the driver always there watching you?  Do you

18  picture the driver standing there for three hours doing

19  nothing but that?  Why, for example, if that's true, why is

20  Mr. Callace paid $15 an hour?  He's stronger.  Does that mean

21  he's stronger than Mr. Godwin physically, muscles?  No.  It

22  means that his experience is stronger.  Mr. Godwin is new at

23  that.  Mr. Callace was experienced.

24          What does that mean?  Who cares if he's experienced

25  if he doesn't do anything different?  Oh, I'm experienced, I'm

1   going to put this over here and I don't know where to put it.

2   You tell me everything.  What's your experience worth?  Why

3   was he invited so often on commercial jobs where you have to

4   have more experience?  Because they want to make sure that

5   things are not broken, that trucks are properly loaded.

6   Safety-related considerations.

7           By the way, Mr. Verderber talked not only as a CEO

8   of the company which he's been, but, remember, he was a driver

9   too.  He didn't just come in here and take over a company.  He

10  drove for many years, drove a truck, learned how to load a

11  truck.  He knows this business.  And what he was saying is

12  things that a driver expects from their helpers.  If I have to

13  go and turn my truck around, if my truck is disabled, I expect

14  those helpers to do something.  That's the testimony you

15  heard.

16          In fact, Mr. Verderber said that some of these

17  people are so experienced, helpers, not drivers, that they

18  don't -- drivers don't even worry about it.  They just let

19  them work completely.  Others get some supervision.  But if

20  there's any -- if the driver checks at the end just to see how

21  everything looks, does that mean that they're not exempt?  You

22  decide that.  You're going to decide the facts.  You have to

23  decide, based on the law that the judge tells you.

24          Well, those are the claims that all three have in

25  common.  Now we go to two claims that are unique to two of the

1  plaintiffs.  The first one is the claim of discrimination, and

2  this is a very, very sensitive claim to Mr. Verderber.  You

3  can see he insisted in his deposition, in his testimony that

4  he doesn't discriminate.  He doesn't discriminate in

5  assignments.  He certainly doesn't seem to discriminate in

6  hiring.  He hired these people.  He's given Mr. Griffin a

7  raise.  Where was the discrimination?

8          Now, you heard two different -- so different that,

9  you know, you have to decide.  Does Mr. Verderber walk around,

10 even occasionally, not every minute but even occasionally

11 shouting out racial epithets to the black, Afro-American,

12 Afro-Caribbean, Haitian as he mentioned?  Does he go around

13 with nasty words, the N word, just freely?  Some woman is

14 standing in a parking lot, says, I'm here to pick up my

15 boyfriend, and he shoots out an N word at her.

16          This is the same guy who invites them to his house,

17 who hires these guys, who gives them raises, who gives them a

18 second chance, it's the same guy who's cursing at them.  Well,

19 Mr. Verderber denied it.  You know, we can't call in ten

20 people to all say, I don't believe it or it never happens.

21          We have Ms. Smith on other things who said she's

22 there 22 years.  Now, she's white, but she has a multiracial

23 child.  She is sensitive.  And if Mr. Verderber were the type

24 of person who was constantly saying things like that, what

25 would her reaction be?  Would she be there 22 years and still

1    there and coming to testify?  You have to decide.

2           And there is no middle ground on this one.  Either

3    he said these things or he didn't say these things.  I tell

4    you he didn't say them.  You have to decide.  If the man

5    you're looking at back there talks like that on a regular

6    basis to his employees who are majority of those groups,

7    Hispanic, Afro-American, it would be insane, let's face it.

8    It would be insane to do that.  But that's not why.  It's that

9    it's not him.

10          Does he get angry?  Yes.  He's told you that.  Don't

11   bother me between 6 and 8 in the morning.  I'm busy.  So if

12   somebody comes up with some question, he might get angry.

13   These guys are movers.  You know, have you ever heard somebody

14   has a mouth like a truck driver?  These are truck drivers.

15   These are guys who move.  These are tough people who live a

16   tough life.  And do they sometimes, I'm sure in the area,

17   curse at one another and joke around in that way?

18          But that's different from what you heard.  You heard

19   malicious, angry curses directed at people because of their

20   race.  And I tell you that's not Keith Verderber and you heard

21   it.  So it's for you to decide.  But consider the evidence.

22   It's very self-serving evidence.  Here are people looking for

23   a payday who come in and say what needs to be said to get the

24   payday.  You may believe them, but think about the

25   circumstances.  Think about the context.  You've worked.  Did

1  you ever hear people talk like that?  If they did, what was

2  the reaction?

3          Mr. Griffin had the most detailed discussion.  He

4  told a few stories about discrimination.  But I don't really

5  think if you think about them that they hold water.  What did

6  he say?  He got a raise in less than two years, which isn't

7  bad, especially, you know, times have been tough.  This was

8  not in the heyday.  This was 2010.  You know, we were just

9  coming back from a pretty tough time.  And he got a raise.  He

10 had a steady job.

11         So what was the discrimination?  Forget the word.

12 Let's for now assume he said that stupid ugly word four times,

13 three times, five times, whatever it is.  How did he

14 discriminate against him?  He sent him out on the jobs.  Did

15 he say, you know what, you're an N word, I'm not going to pay

16 you $14 an hour, I'm going to pay you 10 today, still more

17 than minimum wage, take it or leave it?  He didn't do that.

18 He sent him on the same jobs with the same people.  He had him

19 drive one of the little trucks that he could drive because he

20 didn't have a license for the big trucks yet.  He gave him

21 every opportunity.

22         And yet Mr. Griffin says, he discriminated against

23 me.  What did he do?  What did he do?  He didn't tell us what

24 he did, did he?  Did he tell us how he discriminated against

25 him?  I didn't hear it.  You know, he tells a story about some

1   telephone calls, somebody on the phone talking about some

2   piece of jewelry.  And he says, and the person on the phone

3   said it wasn't Tra and it wasn't Mike.  It wasn't Godwin and

4   Griffin.  What was the point of that?  Did Mr. Verderber

5   accuse him of any of that?  No.  So, you know, it's not clear.

6   What was the discrimination?  They're now looking for money.

7   What was it?  I don't know.

8           He went on jobs like anyone else.  He had overtime.

9   He's even claiming, I didn't get paid for my overtime.  So he

10  had overtime.  He was working hours.  And, in fact, when there

11  wasn't enough work there were times that he went to Mr.

12  Verderber's house, which was work.  Quote, it's work.  He

13  said, I didn't get paid for it or he said something like I

14  don't remember seeing it on my paycheck.  Do you remember

15  that?  What does that mean?  Is it supposed to say Verderber

16  house and you get a different pay scale?  No.  It was just in

17  his paycheck, in his payroll.

18          If he could have -- we had all these pages.  He

19  could have pointed to those pages and said, look, here was a

20  week that I worked and I didn't get paid because I was working

21  at his house.  He didn't do that.  Both he and Mr. Godwin

22  said, well, I have the, you know, slips of paper or something.

23  We didn't see any of that.  All right?  Nothing.  None of that

24  was shown to you.

25          Oh, and also, because of this terrible

1   discrimination, Mr. Griffin told you that he has suffered

2   emotional distress, I think, is that right?  And I asked him

3   about hospital bills or treatment records, and there is

4   nothing.  So if he went to the hospital for terrible

5   treatment, I don't know.  There's no record of that.

6          I would say one has to question if he's so

7   distressed by being called the N word but he's not distressed

8   about raping or sexually abusing a child.  In the scale of

9   evil, there's a big difference there, even if it's true that

10  that word was used, which, again, it wasn't.

11         Oh, by the way, you know, Mr. Griffin made a big

12  point about second day, first day.  I would invite you to take

13  a look at the book, Exhibit A, and look and see where he

14  worked first days and second days on jobs.  See where there

15  was a second day and he didn't work.  See if there were other

16  people that didn't work.

17         Because a lot of times what happens is that Mr.

18  Verderber testified you don't need as many people on the other

19  day.  You have to cut back.  Maybe the first day you have

20  more, the second day you have fewer.  Some jobs, if you look,

21  you'll see on the first day there were fewer and the second

22  day there were more.

23         He talks about tips and he comes up with some number

24  and he talks about tips.  What was that all about?  You know,

25  does Mr. Verderber know about the tips?  Was it ever raised

1   with him?  He doesn't have anything to do with it.  And who

2   would get the tip?  If you worked on a job that was a two-day

3   job and you knew that the driver on the second day collected a

4   tip for the whole job, who would you go to talk to about your

5   share of the tip?  I suggest you talk to the driver.  You'd

6   say, hey, Tom, I worked the first day, what happened to my

7   part of the tip, what, did you take it?  Right?  I mean, it's

8   just common sense.  It's the kind of thing adults do.  If I

9   think I'm entitled to my tip for my first part of the job and

10  someone else collected it, I wouldn't be shy.  Would you?

11  Think about that.

12          But he blames Mr. Verderber, because you know what,

13  it didn't happen.  It doesn't happen.  Mr. Verderber testified

14  it just isn't true, that, first of all, commercial jobs are

15  the least likely to give you a tip, because the guy who's

16  supervising the move is not going to usually give a tip.  And

17  a lot of these he explained were accounts, like a general

18  account, like that NYU or something.  You move for them all

19  the time so you don't get tips most of the time, at least

20  that's what he was told.

21          So this tip thing is, again, it's one of these phony

22  things to say, look, I was discriminated against because I

23  didn't get tips.  Oh, but I did get tips on residential jobs,

24  but then there was something about they sent them to bad

25  neighborhoods or something or poor neighborhoods.  And I

1  question you, because I think a lot of people know from their

2  own lives that people who are very rich are not very generous,

3  and people who often are poor are the most generous people

4  when it comes to a worker that does something for you.

5          But, again, you use your expertise.  There's no

6  evidence here.  There's no one else that they called.  They

7  never called anybody but the three of them.  All these people

8  they worked with, did any of those people come in and say,

9  yes, this happened to me, too, whether they were

10 African-American, Hispanic, whatever?  Did anyone else come in

11 and say, I'm not on the case, but yes, this happened to me,

12 too?  No.

13         And one last thing.  I think it's important.  Mr.

14 Verderber explained that there was another employee that he

15 hired a couple of years ago, also a formerly convicted felon,

16 not for any sexual thing and it was many years earlier.  And

17 he hired that man, paid him $12 an hour, and then he promoted

18 him and he promoted him again, and he's now the man, as Mr.

19 Verderber testified -- Mr. Verderber has been sitting here

20 each day, right?  Who's running the company?  He told you

21 who's running the company.  This guy, this African-American

22 guy who's a convict, a convicted felon, he's now his warehouse

23 manager, $20 an hour, trusted, and doing a great job.

24         Now, he hasn't been here to testify because he's

25 working.  But do you think that this guy also would be working

1   there and taking this crap from Mr. Verderber if this is the

2   way Mr. Verderber talked to him, cursed him out and called him

3   the N word?  Now, you notice one person on the table that

4   might have said he called me but didn't was Mr. Godwin.  I

5   asked him if he was ever cursed at in his eight months.  Well,

6   those must have been N word-free months, because he wasn't

7   cursed at.  Never.  In fact, when he was terminated -- and he

8   was terminated -- you remember what he said?  He said, he told

9   me he couldn't use me in people's houses anymore because of

10  my, you know, my record.  That's what he said.  He didn't say,

11  he cursed me.

12          So let's talk a little bit about that now.  So to

13  me, this is a very important charge, because this is the one

14  where they say, well, you know, there's a law and Mr.

15  Verderber didn't follow the law because he fired these two men

16  because they had a criminal record.

17          Now, we already know that he hires people with

18  criminal records and he keeps them on with criminal records.

19  That's not a problem for him.  In fact, one of the things that

20  Mr. Lichten pointed to, he said, you know, Mr. Verderber never

21  made it clear that when he was doing this he checked the New

22  York State policy on -- something on hiring people with

23  criminal records.  Remember that?  And he said, he looked at

24  me like he had no idea what language I was talking.  Remember

25  that?  Just a few minutes ago.

1          Well, the reality is he probably didn't understand

2    what the heck he was talking about, because he does this all

3    the time.  He embodies it.  He hires these people.  You know,

4    it's very easy for me to pay lip service.  Oh, yes, I hire

5    former convicts.  Oh, sure, sure.  Do I have any in my office?

6    No, no, sorry, nobody now.  He has them.  He hires them.  He

7    embodies it.

8          Does he answer the lawyer in here and say, yes, I

9    embody or I understand the policy of the state of New York?

10   No.  He's a plain, simple guy.  But he acts on it.  So you

11   tell me if he takes that into account.  Did he understand when

12   he was letting these people go if he let Mr. -- we'll get to

13   Mr. Griffin in a second.  If he lets them go, did he

14   understand that this was a difficult choice for him?

15         One of the things I thought was interesting, I'm

16   sure you may have picked up on it too, with each one of them,

17   when he fired Mr. Godwin and even when he talked to Mr.

18   Griffin, whether he fired him or not, how was it done?  Do you

19   remember the testimony?  He called me into his office.  In

20   fact, Mr. Godwin said, he called me at home and said, come

21   into my office, I need to talk to you.  Do you remember that?

22         Think about that.  That's pretty nice for a boss

23   nowadays.  A lot of times they'll have somebody else just call

24   the guy up, tell him not to show up anymore, he's out of here.

25   Why confront the man?  Because he felt he owed him an

1    explanation, and it was a calm, reasoned explanation.

2           But it wasn't -- he didn't sit there and go through

3    a checklist in the law, okay.  He didn't -- let me say this:

4    He didn't know the law word for word the way Mr. Lichten does

5    and the way I do.  What he did know was intuitively the

6    factors, which you will be told in detail by the judge and Mr.

7    Lichten already explained some of them.

8           In other words, what did he look at?  What had

9    happened?  Was it a serious crime?  He thought it was.  Were

10   these people a long time ago, they got out of jail years ago,

11   they've had a whole life since then?  No.  They got out -- Mr.

12   Griffin I think was out of jail less than a year and now he

13   gets a job.  Do we know that he's rehabilitated?

14          One of the things that Mr. Lichten said is Mr.

15   Verderber didn't ask them if they were rehabilitated, right?

16   Well, I ask you a question and I think that the law actually

17   says you, if you're the person that's being questioned about

18   this, it's your obligation to tell the employer that you have

19   been rehabilitated and to provide him with proof of your

20   rehabilitation.  That's one of the factors.

21          Nothing done here.  You heard stories, but we don't

22   have anything that says either one of these men have been

23   rehabilitated.  So we have seriousness, we have proximity,

24   time before you hired them in between.

25          You have other factors.  How old was he?  There's a

1  difference if he was an 18-year-old having consensual

2  relations with a 16-year-old.  I'm not going to say it's

3  right, it's not, but it's a bit different if you're now 40

4  years old and you say, well, when I was 18 I did some things.

5  Maybe I even robbed a store.  I went to jail for a couple

6  years and I've been clean for the last 15 years.

7           No, that's not what happened here.  Right?  This

8  was -- they were 30-, 31-year-old men with children.  So

9  that's another factor.  The judge will tell you all the

10  factors.  You listen to those and you tell me and you tell the

11  judge in your verdict sheet whether or not Mr. Verderber

12  violated the law.  That's your job.  You're going to hear the

13  law from the judge and you're going to apply it to the facts,

14  and you're going to be the ones to decide did he violate the

15  law or not.

16          Now, Mr. Griffin's a little different.  And, again,

17  our position is technically, he didn't really fire him,

18  because what he did say was, because he liked him so much and

19  he was so shocked -- and by the way, he was so shocked and yet

20  Mr. Griffin says, he knew all along I was a sex offender, he

21  knew all along the details.  If he knew all along the details,

22  how come he was so shocked?  How come he let you be in a room

23  with his wife all the time?  How come -- does it make sense?

24          So now, you have Mr. Griffin here and, you know, you

25  say, look -- and, again, this is the Allied thing, okay.

1   Allied is the company for which they're an agent.  Allied has

2   a policy.  This wasn't something Mr. Verderber wanted, not at

3   all, but it was something he had to live with.  And the policy

4   was that if you failed the background check -- and they did

5   fail the background check, based on their criminal record, not

6   everybody fails, every criminal record is not a failure, but

7   they failed -- that he cannot use you.  He cannot use you.

8           It's not really an option.  If he does, he's going

9   to be fined, he'll probably lose his license to be your agent.

10  So he cannot use you on their jobs.  Well, that's most of the

11  work.

12          So, again, Mr. Verderber says, I told them I might

13  be able to use them very limited.  It's not really a living,

14  you're not going to make a living out of it; and that Mr.

15  Griffin said, talk to my lawyer.  Mr. Griffin says he got

16  cursed out.  So, again, it's for you to decide; but in either

17  event, I think if you think he was fired, I think you would

18  say if he had been fired it would have been for an appropriate

19  reason and that it's not a violation of New York State law.

20          So, again, I thank you.  Oh, and by the way, they

21  could have under the law asked for a written statement

22  explaining why they were fired and they never did, neither one

23  of them.  You can ask for a written statement so that then you

24  can say, well, he didn't explain this and this and this and

25  this.  But, you know, when somebody talks to you person to

1    person like that, they're not going to go down a checklist and

2    say, oh, by the way, the this and the this and the this and

3    the this.  He said, I can't use you because of your criminal

4    record, that's it.  You know, but he told you the factors.  He

5    did tell you them.  So, again, you can look at the testimony,

6    you can come back to the judge if you need more testimony.

7    You have the exhibit.  I thank you for your time.  I'm sorry

8    I'm taking so much of your time, but I do appreciate it and

9    it's very important to my client, as you know.  So thank you.

10              THE COURT:  Thank you, Counsel.  Mr. Lichten.

11              MR. LICHTEN:  I just have a few points in response

12   to Mr. Hacker's summation.  I know it's been a long day, I'll

13   just keep it real brief.

14              Mr. Hacker said that does this book -- is this book

15   evidence that Mr. Verderber intentionally tried to cheat

16   people?  Maybe not.  Maybe it's evidence of a very sloppy

17   bookkeeping system.  But it's a sloppy bookkeeping system that

18   always seemed to result in less hours being credited to the

19   person.  So maybe he intentionally has a sloppy bookkeeping

20   system.

21              He's not setting out to say, well, I'm going to pay

22   everyone five hours less each week.  What happens is they get

23   paid five hours less each week because there's no effort being

24   put into making sure this is accurate; and that effort is

25   intentional, and that creates a pattern, and that creates

1   hours that people aren't paid for, and that creates a need to

2   compensate those people.

3           Mr. Hacker repeatedly said that Mr. Verderber must

4   have had a good feeling towards Mr. Griffin because he invited

5   him to his house.  He invited him to his house to do work at

6   his house.  He invited him to do work on his personal house

7   and personal items, and then he says he paid him for that

8   work.  That's not evidence that you like someone.  That's

9   evidence that you like their work.

10          And Mr. Verderber did like Mr. Griffin's work.  Mr.

11  Griffin worked there for two and a half years.  He got a

12  raise.  There's no evidence that his work was bad.  So why did

13  he have to be fired in the end?  Why couldn't he continue to

14  do that job?  He did it for two and a half years and there was

15  no problem.  Mr. Verderber did have him to his house to do

16  work.  And so then that just adds to the question, why was he

17  deemed to be unqualified for this job after two and a half

18  years?

19          Mr. Hacker says that Mr. Callace has more experience

20  and that's why he was paid $15 an hour, and that the

21  experience must be -- have to do with safety on the trucks.

22  Well, the experience might be that he knew how to pack things

23  with paper and so that glasses wouldn't get broken, so that

24  furniture wouldn't be harmed, not necessarily safety of the

25  trucks but safety of the items that are being moved on the

1   trucks.  And that has nothing to do with the exemption or the

2   Motor Carrier Act.

3           Mr. Callace testified he worked primarily in the

4   warehouse.  He must have had experience in knowing how things

5   should be packed in the warehouse, how things should be

6   stored, how things should be taken off the truck so that

7   they're not broken or they're not spoiled or they're not

8   shattered, like glass.

9           Mr. Hacker threw in and said, well, Mr. Griffin

10  wasn't stressed by raping a child.  Mr. Griffin said he thinks

11  about that every day and he's sorry about it and he wishes he

12  could take it back.  He didn't say he wasn't stressed by it.

13  There's no evidence that he wasn't stressed by it, that he

14  wasn't affected by it.

15          What -- Mr. Hacker asked, what is the discrimination

16  here?  What were the discriminatory acts?  Well, as Mr.

17  Griffin laid out, that these jobs take two or three days, the

18  tips are normally given on the last day and the people who

19  aren't there for the last day don't get the tips.  That's the

20  industry practice, that's what the drivers did, and by not

21  assigning him to the last day of these jobs he didn't get paid

22  the tips for those days.  I mean, it's not an enormous amount

23  of money that he resulted in losing because of the

24  discrimination, but it was money nonetheless and it was

25  discrimination nonetheless.

1      Mr. Hacker says that he was a pretty nice boss

2 because he personally told Mr. Griffin to get the fuck out of

3 here.  I don't think that's evidence of a pretty nice boss.  I

4 think that's evidence of someone that's angry and that he was

5 shocked by getting this background check back.

6      And that Mr. Hacker says, well, he doesn't know the

7 law as well as I do.  He doesn't have to know the law as well

8 as I do, but if he's an employer he has to know the employment

9 laws.  He has to know who is entitled to overtime, because

10 that's his job to know that if he's the CEO and the president

11 of a business with 50 employees.

12      He says he doesn't go through a checklist before he

13 fires someone because of their criminal record, but that's

14 exactly what he's supposed to do.  He's supposed to go through

15 this checklist.

16      Mr. Hacker makes fun of the first item on the

17 checklist, which is the public policy of this state, as

18 expressed in the law, to encourage the employment of persons

19 previously convicted of one or more criminal offenses.  That

20 is the law.  I mean, I didn't make it up.  I mean, you can

21 make fun of me, but you can't make fun of the law.  Mr.

22 Verderber was supposed to take that public policy into account

23 before he fired someone.

24      And firing someone is a big deal, especially someone

25 who's worked for you for two and a half years.  Mr. Hacker

1    says, well, if he didn't fire him then he might lose his

2    license.  When he talks about license, he's not talking about

3    a public license that you get from the state.  He's talking

4    about business from Allied.

5              And if he loses business from Allied, the judge will

6    instruct you as to what the relevance of that is.  Nothing.

7    If the law is the law, he has to follow it and he can't just

8    blame it all on Allied or whatever policy he thinks they have

9    with regard to this law that is supposed to encourage

10   employers to keep people on the job who have criminal records.

11             In the end, Mr. Hacker said that they had a right to

12   ask for in writing why they were fired.  They knew why they

13   were fired.  It's obvious why they were fired.  They were

14   fired because their criminal background check came back two

15   days before they were fired and showed they had a criminal

16   record.  Again, in this country if you have a criminal record,

17   you're entitled after you pay your debt and after you serve

18   your time to be able to work and to contribute and to be a

19   productive member of society, and that's all these men want.

20   Thank you.

21             THE COURT:  Thank you, Counsel.  I'm going to take a

22   brief five-minute break and I'll instruct you on the law.

23   It's going to take me about 20 minutes to do so.  So you can

24   go back if you'd like, I am, but it's a brief five-minute

25   break.

1          (Jury exits courtroom.)

2          (Recess.)

3          (Jury enters courtroom.)

4          THE COURT:  Ladies and gentlemen of the jury, now

5    that you have heard the evidence in the case as well as the

6    arguments of each side, it is my duty to instruct you as to

7    the law applicable in this case.  We are all grateful to you

8    for the close attention that you've been giving this case.  I

9    ask that you continue to do so as I give you these

10   instructions.

11         As you know, the plaintiffs, Trathony Griffin,

12   Michael Godwin and Frank Callace, claim that defendant failed

13   to pay them minimum wage for each hour worked, failed to pay

14   them overtime wages, and failed to pay them their agreed-upon

15   hourly rate for all hours worked.  Plaintiffs Griffin and

16   Godwin also claim that defendant discriminated against them on

17   the basis of their race, by giving them less lucrative

18   assignments than those given to Caucasian employees, and that

19   defendant unlawfully terminated their employment because of a

20   prior conviction for a criminal offense.  Defendant Astro

21   Moving and Storage Company denies these claims.

22         My instructions will be in three parts:

23         First, I will instruct you regarding the general

24   rules that define and govern the duties of a jury in a civil

25   case such as this; second, I will instruct you as to the legal

1   elements of plaintiffs' claims; and third, I will give you

2   some general rules regarding your deliberations.

3          Let me start by restating our respective roles as

4   jury and judge.  Your duty, as I mentioned in my opening

5   instructions, is to find the facts from all the evidence in

6   this case.  You are the sole judges of the facts and it is for

7   you and you alone to determine what weight to give the

8   evidence, to resolve such conflicts that may have appeared in

9   the evidence, and to draw such inferences as you deem to be

10  reasonable and warranted from the evidence.

11         My job is to instruct you on the law.  You must

12  apply the law in accordance with my instructions to the facts

13  as you find them.  I remind you of your sworn obligation to

14  follow the law as I describe it to you, whether you agree with

15  it or not.  You should not be concerned about the wisdom of

16  any rule of law that I state.  Regardless of any opinion you

17  may have about what the law may be or should be, it would be a

18  violation of your oaths as jurors to base your verdict upon

19  any other view of the law than given to you in these

20  instructions.

21         If any of the lawyers have stated a legal principle

22  which differs from any that I state to you in my instructions,

23  you must be guided solely by what I instruct you about the

24  law.  You should not single out any one instruction as alone

25  stating the law, but should consider my instructions as a

1   whole.  Since it is your job and not mine to find the facts, I

2   have neither expressed nor attempted to intimate an opinion

3   about how you should decide the facts of this case.  Nothing I

4   have said or done in the course of the trial should be taken

5   by you as expressing an opinion about the facts.  On occasion,

6   I may have asked a question of a witness.  You should attach

7   no special significance to these questions because they were

8   asked by me.

9          You must determine the facts in this case based

10  solely on the evidence or those inferences which can

11  reasonably be drawn from the evidence.  Evidence has been

12  presented to you in the form of sworn testimony from the

13  witnesses, both on direct and cross-examination, and exhibits

14  that have been received in evidence.

15         Certain things are not evidence and are to be

16  entirely disregarded by you in deciding what the facts are:

17  Arguments, statements or summations by the lawyers, objections

18  to the questions or the offered exhibits, and any testimony

19  that has been excluded, stricken, or that you have been

20  instructed to disregard.

21         As I mentioned in my opening instructions, generally

22  speaking, there are two types of evidence:  Direct and

23  circumstantial.

24         Direct evidence is testimony from a witness about

25  something he or she knows by virtue of his or her own senses

1    -- something he or she has seen, felt, touched or heard.

2           The other type of evidence is indirect or

3    circumstantial evidence.  Circumstantial evidence is proof of

4    a chain of circumstances that point to the existence or

5    nonexistence of certain facts.  A simple example of

6    circumstantial evidence would be as follows:  Suppose you came

7    to court on a day when the weather was clear, sunny and dry.

8    It was dry, a little sunny this morning.  However, after

9    several hours in the courtroom where there are no windows, you

10   observe a person come in wearing a wet raincoat and another

11   person shaking a wet umbrella.  Without ever looking outside,

12   you would not have direct evidence that it rained, but you

13   might infer from these circumstances that while you were

14   sitting in court it rained outdoors.  That is all there is to

15   circumstantial evidence.  Based on facts that you find have

16   been proven, you draw such reasonable inferences or

17   conclusions as seem justified in light of your experience and

18   common sense.

19          There is no distinction between direct and

20   circumstantial evidence.  You may use both types of evidence

21   in reaching your verdict in this case.  You must base your

22   verdict on a reasonable assessment of all of the evidence.

23          You are permitted to draw, from the facts which you

24   find to be proven, such reasonable inferences as would be

25   justified in light of your experience.  Inferences are

1   deductions or conclusions that reason and common sense lead

2   you, the jury, to draw from the facts that have been

3   established by the evidence in the case.  Use your common

4   sense in drawing inferences; however, you are not permitted to

5   engage in mere guesswork or speculation.

6           There are times when differing inferences may be

7   drawn from facts, whether proved by direct or circumstantial

8   evidence.  The plaintiffs ask you to draw one set of

9   inferences.  The defendant asks you to draw another set of

10  inferences.  It is for you and you alone to decide what

11  inferences you will draw.

12          No significance should be attached to the fact that

13  a document or other exhibit was introduced by one party rather

14  than by the other.  Any party is entitled to the benefit of

15  any evidence tending to establish its contentions, even though

16  such evidence may have come from witnesses or documents

17  introduced by another party.

18          In deciding the factual issues presented in this

19  case, the test is not which side brings the greater number of

20  witnesses or presents the greater quantity of evidence, but

21  which witnesses and evidence appeal to your minds as being

22  most accurate and trustworthy.

23          In deciding what facts are in the case, you must

24  consider all the evidence that has been offered.  In doing

25  this, you must decide which testimony to believe and which

1    testimony not to believe.  You are the sole judges of

2    credibility -- or believability -- of the witnesses and the

3    weight their testimony deserves.  You should carefully examine

4    all the evidence and the circumstances under which each

5    witness testified, and every matter in evidence that tends to

6    show whether a witness is worthy of your belief.

7            Your determination of the issue of credibility may

8    depend on how the witness impressed you.  Was the witness

9    candid and forthright or did he or she seem to be hiding

10   something or being evasive or suspect in some way?  How did

11   the witness's testimony on direct examination compare with the

12   witness's testimony on cross-examination?  Was the witness

13   consistent in the testimony given or were there

14   contradictions?  Did the witness appear to know what he or she

15   was talking about and did the witness strike you as someone

16   who was trying to report that knowledge accurately?  How much

17   you choose to believe any witness may be influenced by any

18   interest the witness may have in the outcome of the case or by

19   any bias that you may perceive the witness to have.

20           Inconsistencies or discrepancies in the testimony of

21   a witness, or between the testimony of different witnesses,

22   may or may not cause you to discredit such testimony.  In

23   weighing the effects of a discrepancy, you should consider

24   whether it pertains to a matter of importance or an

25   unimportant detail, and whether the discrepancy results from

1    an innocent error or intentional falsehood.

2          If you find that any statement made by a witness on

3    the stand is false, in whole or in part, you may disregard the

4    particular part you find to be false, or you may disregard his

5    or her entire testimony as not worthy of belief.

6          In determining the issues of fact and rendering a

7    verdict in this case, you should perform your duty with

8    complete impartiality and without bias, sympathy or prejudice

9    as to any party.  All parties are equal before the law and all

10   are entitled to the same fair consideration.  All parties

11   expect that you will carefully and impartially consider all

12   the evidence, follow the law as it is now being given to you,

13   and reach a just verdict, regardless of the consequences.

14         As a general rule, in a civil case such as this, the

15   plaintiffs have the burden of proving each of the essential

16   elements of their claims by a preponderance of the evidence.

17   If the proof fails to establish any essential element of the

18   plaintiffs' claims by a preponderance of the evidence, you

19   should find for the defendant.

20         To establish a claim "by a preponderance of the

21   evidence" means to prove that something is more likely so than

22   not so.  In other words, a preponderance of the evidence means

23   such evidence as, when considered and compared with the

24   evidence opposed to it, produces in your mind the belief that

25   what is sought to be proved is more likely true than not true.

1        A preponderance of the evidence means the greater

2   weight of the evidence.  That does not mean the greater number

3   of witnesses or the greater length of time taken by either

4   side.  This determination is based on the quality and

5   persuasiveness of the evidence, the weight and the effect that

6   it has on your minds.

7        In determining whether a claim has been proved by a

8   preponderance of the evidence, you may consider the relevant

9   testimony of all witnesses, regardless of who may have called

10  them, and all the relevant exhibits received in evidence,

11  regardless of who may have produced them.

12       If you find that the credible evidence on a given

13  issue is in balance or evenly divided between the parties,

14  that it is equally probable that one side is right as it is

15  that the other side is right, or that the evidence produced by

16  the party having the burden of proof, which is plaintiffs in

17  this case, is outweighed by evidence against their claims,

18  then you must decide that issue against the party having the

19  burden of proof, or plaintiffs in this case.  That is because

20  the party bearing the burden must prove more than simply

21  equality of evidence -- plaintiffs must prove the elements at

22  issue by a preponderance of the evidence.  On the other hand,

23  plaintiffs need prove no more than a preponderance.  So long

24  as you find that the scales tip, however slightly, in favor of

25  plaintiffs -- that what they claim is more likely true than

1    not true -- then the element will have been proved by a

2    preponderance of the evidence.

3           Some of you may have heard of proof beyond a

4    reasonable doubt, which is the proper standard in a criminal

5    trial.  That requirement does not apply to a civil case and

6    you should put it out of your mind.

7           You have heard evidence that at some earlier time a

8    witness has said or done something which counsel argues is

9    inconsistent with the witness's trial testimony.

10          Evidence of a prior inconsistent statement is not to

11   be considered by you as affirmative evidence in determining

12   liability.  Evidence of a prior inconsistent statement was

13   placed before you for the more limited purpose of helping you

14   decide whether to believe the trial testimony of the witness

15   who contradicted himself or herself.  If you find that the

16   witness made an earlier statement that conflicts with his or

17   her trial testimony, you may consider that fact in deciding

18   how much of his or her testimony, if any, to believe.

19          In making this determination, you may consider

20   whether the witness purposely made a false statement or

21   whether it was an innocent mistake; whether the inconsistency

22   concerns an important fact, or whether it had to do with a

23   small detail; whether the witness had an explanation for the

24   inconsistency, and whether that explanation appealed to your

25   common sense.  It is exclusively your duty, based upon all the

1  evidence and your own judgment, to determine whether the prior

2  statement was inconsistent, and if so how much, if any, weight

3  to give to the inconsistent statement in determining whether

4  to believe all or part of the witness's testimony.

5          Now I am turning to the specific claims in this

6  case.  You must consider the evidence separately with respect

7  to each count and with respect to each plaintiff.  You will be

8  asked to render a separate verdict in each count, and I will

9  provide you with a verdict sheet that will assist you in doing

10  so.

11          By way of review, plaintiffs make three types of

12  claims:  First, all three plaintiffs claim that defendant

13  failed to pay them minimum wage, failed to pay them overtime,

14  and failed to pay them the agreed-upon wage; second,

15  Plaintiffs Griffin and Godwin claim employment discrimination

16  on the basis of race; and third, Plaintiffs Griffin and Godwin

17  claim that defendant wrongfully terminated their employment on

18  the basis of their prior criminal conviction.

19          The Fair Labor Standards Act, which I may sometimes

20  refer to as FLSA, and the New York Labor Law, both require

21  employers to pay minimum wages to their employees at a rate

22  that is set by law.  Both laws also require employers to pay

23  overtime wages to their employees who work longer than 40

24  hours in a workweek.  Under both the Fair Labor Standards Act

25  and the New York Labor Law, compensation for hours worked in

1  excess of 40 hours is calculated at a rate not less than one

2  and one-half times either the minimum wage or the regular rate

3  at which the employee is paid, whichever is higher.

4          The provisions of both the Fair Labor Standards Act

5  and the New York Labor Law are identical in a number of

6  respects.  I will only point out the differences between the

7  two laws when it is necessary to do so.

8          To make out a minimum wage claim under the Fair

9  Labor Standards Act, plaintiffs must prove each of the

10 following three elements by a preponderance of the evidence:

11 First, plaintiffs must prove that each was an employee of the

12 defendant during the relevant time period; second, plaintiffs

13 must prove that they were employees engaged in commerce or the

14 production of goods for commerce, or that they were employed

15 by an enterprise engaged in commerce or the production of

16 goods for commerce; third, plaintiffs must prove that the

17 defendant failed to pay the minimum wage as required by law.

18 The elements required to prove a violation of the minimum wage

19 provisions of the New York Labor Law are essentially the same.

20         In this case, the parties have stipulated that the

21 first two elements are met and you, therefore, do not need to

22 concern yourself with these elements.  However, the parties

23 disagree on whether plaintiffs were properly paid the legally

24 required minimum wage during at least some portion of the time

25 they were employed by defendant.

1        To prevail on this claim, plaintiffs must prove, by

2   a preponderance of the evidence, that the pay they received

3   for any one or more weeks was not the amount they should have

4   received, according to the law, for the hours they proved they

5   worked.

6        During the relevant time period, the minimum wage

7   was $7.25 per hour.  This means that for every hour up to and

8   including 40 hours in a given week that each plaintiff proves

9   by a preponderance of the evidence that he worked, plaintiffs

10  are entitled to receive at least $7.25 per hour.

11       If you find that Plaintiff Griffin was not paid the

12  minimum wage of $7.25 per hour for any part of the time he

13  proved by a preponderance of the evidence that he worked for

14  defendant between July 27, 2008 and February 14, 2011, then

15  you must find in favor of Plaintiff Griffin on his minimum

16  wage claim.

17       If you find that Plaintiff Godwin was not paid the

18  minimum wage of $7.25 per hour for any part of the time that

19  he proved by a preponderance of the evidence that he worked

20  for defendant between May 23, 2010 and February 12, 2011, then

21  you must find in favor of the Plaintiff Godwin on his minimum

22  wage claim.

23       If you find that Plaintiff Callace was not paid the

24  minimum wage of 7.25 per hour for any part of the time that he

25  proved by a preponderance of the evidence that he worked for

1   defendant between May 24, 2009 and September 14, 2010, then

2   you must find in favor of the Plaintiff Callace on his minimum

3   wage claim.

4          Turning to the overtime claim.  In order to prove

5   that defendant failed to pay them overtime wages under the

6   Fair Labor Standards Act, plaintiff must prove, all three

7   plaintiffs must prove three elements by a preponderance of the

8   evidence:  First, plaintiffs must prove that they were

9   employees of defendant during the relevant time period;

10  second, that plaintiffs were employees engaged in commerce or

11  the production of goods for commerce, or that they were

12  employed by an enterprise engaged in commerce or the

13  production of goods for commerce.  As discussed earlier, the

14  parties have stipulated that these two elements are met and

15  you, therefore, do not need to concern yourself with them.

16  However, the parties disagree as to whether plaintiffs are

17  owed any overtime wages.

18         When employees work more than 40 hours in a week,

19  the law requires that they receive what is commonly known as

20  overtime pay.  The amount of overtime that is due under the

21  law is one-and-one-half times the employee's regular wage or

22  one-and-one-half times the legal minimum wage, whichever is

23  greater.  To prove that they were not paid overtime pay as

24  required by the law, the plaintiffs must establish by a

25  preponderance of the evidence that during part or all of the

1  time period they worked for the defendant, the defendant did

2  not pay them the legally required additional amount for the

3  hours they worked in excess of 40 hours for any given week.

4  Again, the elements required to prove a violation of both

5  laws, the Fair Labor Standards Act and the New York Labor Law,

6  are essentially the same.

7          The defendant is responsible for maintaining

8  accurate records of plaintiffs' hours.  Where the defendant's

9  records are inaccurate or inadequate, plaintiffs merely need

10 to show that they had, in fact, performed work for which they

11 are improperly compensated, and to show the amount of that

12 work as a matter of just and reasonable inference.  The burden

13 then shifts to defendant to come forward with evidence of the

14 precise amount of work performed or with evidence to negate

15 the reasonableness of the inference to be drawn by plaintiffs'

16 evidence.  If the defendant fails to produce such evidence,

17 you may then award damages to the plaintiffs even though the

18 results be only approximate.  The plaintiffs may testify from

19 their present memory and recollection alone.

20         The employee's regular wage for a given week is

21 calculated by taking the employee's total weekly compensation,

22 divided by the number of hours for which that compensation was

23 intended.  If you find that the plaintiffs' regular wage rate

24 was less than the minimum wage, then overtime should be

25 calculated based on the legal minimum wage that the plaintiffs

1  were entitled to have received for the time period in question

2  and not on what the plaintiffs were actually paid.  As an

3  example, if you were to find that plaintiffs received less

4  than the minimum wage between June 5, 2010 and June 11, 2010,

5  then for the hours they worked in excess of 40 hours in a

6  week, you would multiply the minimum wage in effect at that

7  time, which was $7.25, by 1.5 to get plaintiff's proper

8  overtime rate.  This means that you would get an overtime rate

9  of $10.87 for the period from June 5, 2010 to June 11, 2010

10  were you to find that they were paid the minimum wage, or

11  less, as their regular rate.

12          If you find that the plaintiffs have proven all of

13  the facts necessary to establish their overtime claims, you

14  must then consider whether defendant has proven by a

15  preponderance of the evidence that plaintiffs' job duties

16  prevent them from obtaining overtime.  Here, defendant has the

17  burden of proof.  Defendant contends that because it is a

18  motor carrier, plaintiffs do not qualify for overtime pay

19  under the Fair Labor Standards Act because of the motor

20  carrier exemption.

21          Defendant claims that as "helpers" or "loaders,"

22  plaintiffs' duties included "loading" items into trucks, and

23  that these "loading" duties fall within the motor carrier

24  exemption.  In order to prove that plaintiffs are not entitled

25  to overtime pay, defendant must prove by a preponderance of

1   the evidence that plaintiffs had employment responsibilities

2   and tasks that affected motor vehicle operation safety and

3   that such tasks constituted a substantial part of their

4   ordinary employment activities, that is, that any such

5   responsibilities and tasks were not so "trivial, casual, or

6   occasional" to be de minimus.

7           Defendant must show that plaintiffs had

8   responsibility when a motor vehicle is being loaded to

9   exercise some degree of judgment and discretion in planning

10  and building a balanced load or in placing, distributing, or

11  securing the pieces of freight in such a manner that the safe

12  operation of the vehicles on the highways in interstate

13  commerce will not be jeopardized.  Plaintiffs are not engaged

14  in safety operations if their duties did not include planning

15  and building a balanced load, or placing, distributing or

16  securing the pieces of freight, or any such tasks were so

17  trivial and insignificant as to be de minimus.

18          Defendant must show that as a driver's helper,

19  plaintiffs were required to ride in defendant's vehicles when

20  it is being operated across state lines or across

21  international borders.  Examples of activities that would be

22  performed by a driver's helper include placing flags, flares

23  and fuses as required by the safety regulations, going for

24  assistance while the driver protects the vehicle on the

25  highway, or vice versa, assisting the driver with changing

Case 2:11-cv-01844-MKB-SIL   Document 85   Filed 07/02/15   Page 103 of 121 PageID #: 947

1   flat tires or making minor repairs, and assisting in putting

2   on or removing chains.

3        If you find that plaintiffs were engaged in

4   activities that affect the safety of operations, the defendant

5   is not liable for failure to pay overtime wages.  However, if

6   you find that plaintiffs had no more than trivial

7   responsibilities and tasks that affected motor vehicle safety

8   of operation, then you may find defendant liable for failure

9   to pay plaintiffs overtime.

10       Plaintiffs also seek to recover unpaid regular wages

11  under the New York Labor Law.  If you find that plaintiffs

12  have proven by a preponderance of the evidence that defendant

13  failed to pay him for the hours that they actually worked,

14  then you must find in favor of plaintiffs in an amount equal

15  to plaintiffs' standard hourly rate of pay multiplied by the

16  number of hours that plaintiffs worked but were not paid.  If

17  you find that plaintiffs have failed to prove by a

18  preponderance of the evidence that they were not paid for all

19  the hours that they worked, then you must decide in favor of

20  defendant on plaintiffs' claim for unpaid regular wages.

21       Under the law, all workweeks stand alone.  This

22  means that it is not necessary for you to determine the hours

23  worked by the plaintiffs -- I'm going to read that again.

24  This means that it is necessary for you to determine the hours

25  worked by the plaintiffs on a weekly basis in determining

1    whether or not they were paid overtime compensation for the

2    hours worked in excess of 40 hours each workweek.  The law

3    does not permit the averaging of hours worked during

4    workweeks.  You cannot reduce the number of overtime hours you

5    find plaintiffs worked by hours not worked by plaintiffs in

6    other weeks.  For example, if an employee worked 50 hours

7    during one week and 30 hours the next, that employee must be

8    found to have worked ten overtime hours.  You cannot find the

9    employee worked less than 10 overtime hours because of a

10   workweek where the employee worked fewer than 40 hours.

11         If you find that defendant violated the Fair Labor

12   Standards Act, then you must determine whether that violation

13   was willful.  To find defendant's violation was willful, you

14   must find that plaintiffs have proven by a preponderance of

15   the evidence that the defendant knew of its obligation to pay

16   minimum wages or overtime or both and failed to pay them, or

17   that defendants recklessly or voluntarily disregarded their

18   obligation to pay minimum wages or overtime wages or both, and

19   failed to pay them.  In other words, a violation of the

20   applicable law is willful if it is knowing, deliberate, and

21   voluntary or in reckless disregard of these obligations.

22         If you find in favor of any of the plaintiffs on

23   their New York Labor Law claims, you must determine whether

24   defendant had a good faith basis to believe that its

25   underpayments were in compliance with the law.  The defendant

1   bears the burden of proof to show that its failure to comply

2   with the law, should you so find, was in good faith.  To

3   establish good faith, the defendant must show that it had an

4   honest intention to ascertain and follow the dictates of the

5   law and that it had reasonable grounds for believing that its

6   conduct complied with the law.

7          Turning to Plaintiffs Griffin and Godwin's

8   discrimination claim based on race.  In this case, Plaintiffs

9   Griffin and Godwin claim that defendant discriminated against

10  them on the basis of their race by assigning them less

11  lucrative jobs than similarly situated Caucasian employees.

12  Plaintiffs bring this claim under Section 1981 of Title 42 of

13  the United States Code and under New York Executive Law

14  Section 296, which is also known as the New York State Human

15  Rights Law.  Title 42, United States Code, Section 1981

16  provides, in relevant part:

17         All persons within the jurisdiction of the United

18  States shall have the same right in every state and territory

19  to make and enforce contracts, to sue, be parties, give

20  evidence, and to the full and equal benefit of all laws and

21  proceedings for the security of persons and property as is

22  enjoyed by white citizens, and shall be subject to like

23  punishment, pains, penalties, taxes, license, and exactions of

24  every kind, and to no other.

25         The provisions of both Section 1981 and the New York

1   State Human Rights Law are identical in most respects, and

2   I'll only point out the differences where necessary.

3           To establish a claim under Section 1981, plaintiffs

4   must prove, by a preponderance of the evidence, the following

5   three elements:  First, that the plaintiffs are members of a

6   class protected by Section 1981; second, that the defendant

7   intentionally discriminated against plaintiffs on the basis of

8   race; and third, that the discrimination interfered with a

9   protected activity as defined in Section 1981.

10          I instruct you that Plaintiffs Griffin and Godwin

11  are members of the African-American group, which is protected

12  by Section 1981.  Therefore, plaintiffs have established the

13  first element.

14          To prove this claim, Plaintiffs Griffin and Godwin

15  must prove, by a preponderance of the evidence, that in taking

16  the action complained of, the defendant was motivated, at

17  least in part, by a racially discriminatory purpose, that is,

18  Plaintiffs Griffin and Godwin must prove that the defendant

19  intentionally and purposefully discriminated against them

20  because of their race.

21          In determining whether the defendant intentionally

22  discriminated against plaintiffs in assigning jobs on the

23  basis of their race, you may consider all the evidence

24  presented in the case.  However, keep in mind that it is not

25  enough for the plaintiffs to show that the defendant's actions

1   had a discriminatory effect; the plaintiffs must show that, in

2   taking these actions, the defendant had, at least in part, a

3   discriminatory purpose or intent.

4        If Griffin or Godwin proves that defendant acted

5   with discriminatory intent, then plaintiffs must also prove,

6   in order to prevail, that such action interfered with a right

7   protected by Section 1981, such as the right to contract.  The

8   parties agree that plaintiffs' allegations that they were

9   discriminated against in the assignment of job falls under the

10  right to contract and, as such, is protected by Section 1981.

11       Turning to the final claim, Plaintiffs Griffin and

12  Godwin claim that their employment was unlawfully terminated

13  because they each have been convicted of a criminal offense.

14  They bring this claim under New York Executive Law Section

15  296(15), which is also known as the New York Human Rights Law.

16  This statute provides, in relevant part:

17       It shall be an unlawful discriminatory practice for

18  any person, agency, bureau, corporation or association,

19  including the state and any political subdivision thereof, to

20  deny any license or employment to any individual by reason of

21  his or her having been convicted of one or more criminal

22  offenses, or by reason of a finding of a lack of "good moral

23  character" which is based upon his or her having been

24  convicted of one or more criminal offenses, when such denial

25  is in violation of the provisions of the correction law.

1      The defendant may terminate an employee based upon

2  their criminal conviction if defendant shows that there is a

3  direct relationship between one or more of the previous

4  criminal offenses and the specific employment sought or held

5  by the individual or the granting or continuation of the

6  employment would involve an unreasonable risk to property or

7  to the safety or welfare of specific individuals or the

8  general public.  "Direct relationship" means that the nature

9  of the criminal conduct for which the plaintiffs were

10  convicted have a direct bearing on each plaintiff's fitness or

11  ability to perform one or more of the duties or

12  responsibilities of a helper.

13      In determining if there is a direct relationship or

14  an unreasonable risk, you may consider, one, New York State

15  public policy to encourage the licensure and employment of

16  persons previously convicted of one or more criminal offenses;

17  two, plaintiffs' specific duties and responsibilities; three,

18  the bearing, if any, the criminal offense for which each

19  plaintiff was previously convicted will have on his fitness or

20  ability to perform one or more such duties or

21  responsibilities; four, the length of time since the

22  occurrence of the criminal offense or offenses; five, the age

23  of the plaintiff at the time of the occurrence of the criminal

24  offense or offenses; six, the seriousness of the offense or

25  offenses; seven, any information produced by the plaintiffs or

1   produced on their behalf, in regard to their rehabilitation

2   and good conduct; and eight, the legitimate interest of

3   defendant in protecting property and the safety and welfare of

4   specific individuals or the general public.

5           If you find that there was a direct relationship

6   between the plaintiffs' prior convictions and their specific

7   job duties, then you must find for defendant.  If, however,

8   you find that there was no direct connection between

9   plaintiffs' prior convictions and their specific job duties,

10  you must find for plaintiffs.

11          Defendant contends that it did not terminate

12  Plaintiff Griffin.  If you find that Plaintiff Griffin was not

13  terminated, but that he quit voluntarily, you must find that

14  defendant did not violate the statute as to Plaintiff Griffin.

15          If, however, you find that defendant unreasonably

16  terminated Plaintiffs Griffin and Godwin because of their

17  criminal conviction, in violation of the statute, then you

18  must find for Plaintiffs Griffin and Godwin.

19          Requirements, preferences, or attitudes of

20  defendants' clients, customers, or principals such as Allied

21  Van Lines or Sirva, Inc. are not relevant to your

22  determination of whether or not defendant complied with its

23  obligations under the statute.

24          Now I'm going to instruct you on damages, but let me

25  caution you that just because I am instructing you on how to

1   award damages does not mean that I have any opinion on whether

2   or not the defendant should be held liable for any of

3   plaintiffs' claims.  If the plaintiffs have proven by a

4   preponderance of the evidence that the defendant is liable,

5   you must determine the actual damages to which each plaintiff

6   is entitled.  It is exclusively your function to decide upon

7   liability, and I am instructing you on damages only so that

8   you will have guidance should you decide that plaintiffs are

9   entitled to recovery.

10          As to plaintiffs' minimum wage, actual pay and

11  overtime claims, you should only consider the issue of damages

12  if you first find that the plaintiffs have proven by a

13  preponderance of the evidence that the defendants violated the

14  Fair Labor Standards Act under New York Labor Law.  If you

15  return a verdict for the defendant, then you need not consider

16  damages on this claim.

17          If you find that any plaintiff has proven that the

18  defendant is liable to him for unpaid minimum wages and/or

19  unpaid overtime, then you must determine what amount of money

20  that plaintiff is owed.  This determination must be made for

21  each plaintiff.  The measure of damages is the difference

22  between the amount you find that plaintiff should have been

23  paid under the minimum wage and overtime laws and the amount

24  you find that the defendant actually paid to the plaintiff you

25  are considering.

1       In determining the amount of damages that you decide

2   to award, you should be guided by dispassionate common sense.

3   You must use sound discretion in fixing an award of damages,

4   drawing reasonable inferences from the facts in evidence.  You

5   may not award damages based on sympathy, speculation or

6   guesswork.  On the other hand, the law does not require that

7   plaintiffs prove the amount of their losses with mathematical

8   precision, but only with as much definitiveness and accuracy

9   as circumstances permit.  The unpaid wages can be inferred

10  from the circumstances presented to you by the evidence, or

11  they can be proven by testimony going solely to the issue of

12  damages.

13       Remember, it is plaintiffs' burden to prove that

14  they are owed unpaid wages and to prove the amount.  The award

15  must be based upon evidence and not upon speculation,

16  guesswork or conjecture.

17       If you find that Plaintiff Griffin or Plaintiff

18  Godwin has proved by a preponderance of the evidence all three

19  elements of their race discrimination claim, and/or that

20  defendant terminated their employment based upon their

21  criminal convictions, in violation of New York State Human

22  Rights Law, you must then consider the issue of damages.

23  Damages must be based on evidence, and plaintiffs have the

24  burden of proving damages by a preponderance of the evidence.

25       You must award the plaintiffs the sum of money that

1    will justify and fairly compensate them for any injury you

2    find they suffered as a direct result of the defendant's

3    violation.  Compensatory damages must be based on evidence,

4    not speculation or sympathy.  At the same time, in determining

5    the amount of the award, it may often be impossible for you to

6    arrive at a precise amount.  For example, compensatory damages

7    are available for emotional distress and humiliation under

8    Section 1981 and under the New York State Human Rights Law.

9    It is difficult to arrive at a precise calculation of actual

10   damages for emotional harm from a violation of these laws.

11   Nonetheless, it is necessary to arrive at a reasonable award

12   that is supported by the evidence offered by the plaintiffs.

13          If the plaintiffs prove that the injury they

14   suffered extends into the future because they will be denied

15   future economic opportunities as a result of the defendant's

16   discriminatory actions, then the damages you award may

17   compensate them for that loss.  In making your calculation,

18   however, you must include a reduction of future damages, as in

19   loss of income, to present value in order to take into account

20   the earning power of the money awarded.

21          The damages you award may include an award of back

22   pay.  You may determine the amount of back pay or lost wages

23   that is due to plaintiffs by calculating the hours of work and

24   the amount of wages lost by the plaintiffs as a result of the

25   violation of Section 1981 and/or the New York State Human

1   Rights Law.

2          Even if you find that no actual damages were proven,

3   you should award the sum of $1 -- which is called "nominal

4   damages" -- to reflect your finding that the defendant is

5   liable for a violation of Section 1981 and/or the New York

6   State Human Rights Law.

7          In considering damages you will award to the

8   plaintiffs, you must remember that the plaintiffs are

9   obligated to take reasonable steps to mitigate or diminish the

10  damages suffered.  It is, however, the defendant's burden to

11  prove, by a preponderance of the evidence, that the plaintiffs

12  failed to take reasonable steps to diminish the extent of the

13  injuries suffered.  If the defendant proves this, you should

14  reduce your award by the amount of damages that would have

15  been avoided if the plaintiffs had taken reasonable steps to

16  mitigate the consequences of the harm.

17         Whether or not you award plaintiffs actual damages,

18  you may also, in your discretion, make an award of punitive

19  damages.  Punitive damages are awarded, in the discretion of

20  the jury, to punish a defendant for extreme or outrageous

21  conduct, and to deter or prevent a defendant and others like

22  him or her from committing such conduct in the future.

23         You may award plaintiff punitive damages if you find

24  that the acts of defendant were done maliciously or wantonly.

25  An act is maliciously done if it is prompted by ill will or

1    spite towards the injured person.  An act is wanton if done

2    with a reckless or callous disregard for the rights of the

3    injured person.  Plaintiffs have the burden of proving by a

4    preponderance of the evidence that the defendant acted

5    maliciously or wantonly with regard to plaintiffs' rights.

6           If you find by a preponderance of the evidence that

7    defendant acted with a malicious intent to violate plaintiffs'

8    rights, or if you find that a defendant acted with a callous

9    or reckless disregard of plaintiffs' rights, then you may

10   award punitive damages.  An award of punitive damages,

11   however, is discretionary; that is, if you find that the legal

12   requirements for punitive damages are satisfied, then you may

13   decide to award punitive damages, or you may decide not to

14   award them.

15          In making that decision, you should consider the

16   underlying purpose of punitive damages.  Punitive damages are

17   awarded in the jury's discretion to punish a defendant for

18   outrageous conduct or to deter him or her and others like him

19   or her from performing similar conduct in the future.  Thus,

20   in deciding whether to award punitive damages, you should

21   consider whether the defendant may be adequately punished by

22   an award of actual damages only, or whether the conduct is so

23   extreme and outrageous that actual damages are inadequate to

24   punish the wrongful conduct.

25          You should also consider whether actual damages,

1    standing alone, are likely to deter or prevent the defendant

2    from similar wrongful conduct in the future, if it was in fact

3    wrongful, or whether punitive damages are necessary to provide

4    deterrence.  Finally, you should consider whether punitive

5    damages are likely to deter or prevent other persons from

6    performing wrongful acts similar to those the defendant may

7    have committed.

8         If you decide to award punitive damages, these same

9    purposes should be kept in mind as you determine the

10   appropriate sum of money to be awarded.  This is, in fixing

11   the sum to be awarded, you should consider the degree to which

12   the defendant should be punished for his or her wrongful

13   conduct, and the degree to which an award of one sum or

14   another will deter the defendant or persons like him or her

15   from committing wrongful acts in the future.

16        I guess that means it's time to end for the day.  My

17   mic just decided to go out without any effort on my part.

18        I am now giving you closing instructions, and I

19   realize that it has taken me longer than I expected.  It is

20   now 5:25.  So after I give you the closing instructions, I'll

21   let you leave for tonight and come back tomorrow morning, 9:30

22   or 10.  You tell me which you prefer.  You, however, will not

23   be able to deliberate until you are all present.

24        I have now outlined for you the rules of law

25   applicable to this case, the process by which you weigh the

1   evidence and determine the facts, and the legal elements which

2   must be proved by a preponderance of the evidence.  Tomorrow

3   morning you will retire to the jury room for your

4   deliberations, and I'm giving you just some general rules that

5   you should keep in mind.

6          Keep in mind that nothing I have said in these

7   instructions is intended to suggest to you in any way what I

8   think your verdict should be.  That is entirely for you to

9   decide.

10         By way of reminder, I instruct you once again that

11  it is your responsibility to judge the facts in this case from

12  the evidence presented during the trial and apply the law as I

13  have now given it to you.  Remember also that your verdict

14  must be based solely on the evidence in the case and the law.

15         In order for your deliberations to proceed in an

16  orderly fashion, you must have a foreperson.  The custom in

17  this courthouse is for Juror No. 1 to be the foreperson.

18  However, if and when you begin your deliberations, you decide

19  that you want to elect another person, you are free to do so.

20  Of course, the foreperson's vote has no more weight than

21  everyone else's.

22         It is very important that you not communicate with

23  anyone outside of the jury room about your deliberations or

24  about anything touching on this case.  There is only one

25  exception to this rule.  If it becomes necessary during your

1  deliberations to communicate with me, you should send a note

2  through the marshal signed by your foreperson.  There will be

3  a marshal sitting outside of your jury room for the entire

4  duration of your deliberation.  The note has to be signed by

5  the foreperson.  All notes should be signed by the foreperson.

6          No member of the jury should attempt to communicate

7  with me except by signed writing, and I will never communicate

8  with any member of the jury on any subject touching upon the

9  merits of this case other than in writing or orally here in

10  court.

11          Your recollection governs, no one else's.  If, in

12  the course of your deliberations, your recollection of any

13  part of the testimony should fail, or you should find yourself

14  in doubt concerning my instructions on the law, you can return

15  to the courtroom for the purpose of having such testimony or

16  instructions read back to you.  You want to make that request

17  by sending a note to the marshal.  I suggest that you try to

18  be specific so that you avoid hearing testimony that you do

19  not need to hear.  Tell me as best as you can precisely what

20  evidence you would like to hear or instruction of law and be

21  patient while we find it.  Sometimes it does take us a minute

22  to do so.  If you want to see any of the exhibits, please send

23  me a note and the requested exhibit will be sent back to you.

24          Your duty is to reach a fair conclusion from the law

25  and the evidence.  It is an important one.  When you are in

1   the jury room, listen to each other and discuss the evidence

2   and the issues in the case amongst yourself.  It is the duty

3   of each of you, as jurors, to consult with one another and to

4   deliberate with a view toward reaching agreement on a verdict,

5   if you can do so without violating your individual judgment

6   and conscience.  While you should not surrender conscientious

7   convictions of what the truth is and of the weight and effect

8   of the evidence, and while each of you must decide the case

9   for yourself and not merely acquiesce in the conclusion of

10  your fellow jurors, you should examine the issues and the

11  evidence before you with candor and frankness, and with proper

12  deference to, and regard for, the opinions of your fellow

13  jurors.

14          You should not hesitate to reconsider your opinions

15  from time to time and to change them if you are convinced that

16  they are wrong.  However, do not surrender an honest

17  conviction as to the weight and effect of the evidence simply

18  to arrive at a verdict.

19          The decision you reach must be unanimous.  You must

20  all agree.  When you have reached a verdict, simply send me a

21  note signed by the foreperson that you've reached a verdict.

22  Do not indicate what the verdict is.  In no communication with

23  me should you give a numerical count of where the jury stands.

24          Remember in your deliberations that the dispute

25  between the parties is, for them, no passing matter.  They and

1  the Court rely upon you to give full and conscientious

2  deliberation and consideration to the issues and evidence

3  before you.  By so doing, you carry out to the fullest your

4  oaths as jurors to well and truly try the issues of this case

5  and a true verdict render.

6          That is the charge.  I am simply going to meet with

7  the parties for one minute at sidebar to see if there's

8  anything else they want me to add.

9          (The following occurred at sidebar.)

10         THE COURT:  Anything I need to add?

11         MR. LICHTEN:  No.

12         MR. HACKER:  No, nothing to add.

13         (End of sidebar.)

14         THE COURT:  We're done.  I'm going to swear the

15  marshal so that tomorrow morning when you come in just --

16  would you like to start at 9:30 or 10?

17         THE JURORS:  10.

18         THE COURT:  10:00 it is.  Can you swear the marshal?

19         (Marshal sworn.)

20         THE COURT:  Okay.  So I'm discharging you for

21  tonight because of the late hour.  I do remind you that when

22  you come in in the morning, if anyone is running late you have

23  to wait until you are all together.  You cannot start your

24  deliberations without everyone being present.  Okay?  Yes?

25         THE JURORS:  Do we sign in downstairs first?

Case 2:11-cv-01844-MKB-SIL   Document 85   Filed 07/02/15   Page 120 of 121 PageID #: 964

1           THE COURT:  Do they have to sign in?

2           COURTROOM DEPUTY:  Yes.

3           THE COURT:  Yes, you do.  Have a good night.  Don't

4    discuss the case.  You still can't discuss it, not even

5    amongst yourself, until you're all together tomorrow.  Have a

6    good night.

7           (Jury exits courtroom.)

8           THE COURT:  I'll see the parties at 10 tomorrow.

9    Have a good night.

10          MR. LICHTEN:  Good night.

11          MR. HACKER:  Good night, Your Honor.

12          (Whereupon, the proceedings were adjourned until

13   10:00 a.m. November 21, 2014.)

14

15

16

17

18

19

20

21

22

23

24

25

121

1                    I N D E X

2

3   WITNESS

4   LAURA SMITH                                    2

5       DIRECT EXAMINATION                         2

6       BY MR. HACKER

7       CROSS-EXAMINATION                          5

8       BY MR. LICHTEN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25